```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: September 30, 2010
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
In re FANNIE MAE 2008 SECURITIES  :          08 Civ. 7831 (PAC)
LITIGATION                                      :          09 MD 2013 (PAC)
                                                          :
                                                          :          OPINION & ORDER
-----------------------------------------------------------x


HONORABLE PAUL A. CROTTY, United States District Judge:


## BACKGROUND[1]

The early years of this decade saw a boom in home financing which was fueled, among other things, by low interest rates and lax credit conditions. New lending instruments, such as subprime mortgages (high credit risk loans) and Alt-A mortgages (low-documentation loans) kept the boom going. Borrowers played a role too; they took on unmanageable risks on the assumption that the market would continue to rise and that refinancing options would always be available in the future. Lending discipline was lacking in the system. Mortgage originators did not hold these high-risk mortgage loans. Rather than carry the rising risk on their books, the originators sold their loans into the secondary mortgage market, often as securitized packages known as mortgage-backed securities ("MBSs"). MBS markets grew almost exponentially.

But then the housing bubble burst. In 2006, the demand for housing dropped abruptly and home prices began to fall. In light of the changing housing market, banks modified their lending practices and became unwilling to refinance home mortgages without refinancing.

---

[1] Unless otherwise indicated, all references cited as "(¶ _)" or to the "Complaint" are to the Amended Complaint, dated June 22, 2009. For purposes of this Motion, all allegations in the Amended Complaint are taken as true.

Subprime and Alt-A mortgage borrowers were unable to meet their loan obligations and the value of subprime and Alt-A MBSs dropped precipitously.  Given the ubiquity and proliferation of MBSs, the economy began to totter, and by 2008 was in near collapse.  Litigation erupted immediately, including numerous suits involving the Federal National Mortgage Association ("Fannie").

Fannie played a critical role in developing and sustaining the secondary mortgage market. Indeed, Fannie was at the center of the U.S. housing market and one of its main driving forces. In 1968, Congress chartered Fannie as a government sponsored enterprise.  (¶ 40.)  Under its statutory charter, Fannie is to provide stability, liquidity, and affordability in the U.S. housing market. 12 U.S.C. § 1716-1719.  Fannie discharges this mandate by investing exclusively in the secondary residential mortgage market — Fannie does not loan money directly to borrowers.  (¶ 41.)

Specifically, Fannie's business is comprised of two components: (i) a credit guaranty business, and (ii) a portfolio investment business.  (Id.)  With respect to its credit guaranty business, Fannie purchases mortgages from primary lenders and resells those mortgages as MBSs, guaranteeing its mortgages if the initial borrower defaults.  (¶ 42.)  Fannie generates income through the fees it charges for its guarantees.  (¶ 42-43.)  With respect to its portfolio investment business, Fannie holds mortgage loans, mortgage-related securities, and other securities that it purchases from commercial banks for its own investment purposes, funding these portfolio purchases by issuing short and long term debt and debt securities to domestic and international capital market investors.  (¶ 44.)  Fannie profits when the income from mortgage assets and other investments in its portfolio exceeds the interest Fannie pays its debt-holders. (Id.)

Beginning in 2006, and partially responding to pressure from mortgage lenders, Fannie increased its investments in subprime and Alt-A mortgages.  By year-end 2006, Fannie had an exposure of $345 billion in Alt-A and subprime assets; by late 2007, Fannie had a total subprime and Alt-A exposure of $405 billion.[2]  (¶ 9, 76.)  When the U.S. housing market nearly collapsed, Fannie plunged into insolvency.  (¶ 17.)

On September 17, 2008, however, the Federal Housing Finance Agency ("FHFA"), one of Fannie's government regulators, assumed conservatorship of Fannie, citing concerns with regard to Fannie's credit risk, earnings outlook, and capitalization.  (¶ 415, 417.)  As Conservator, FHFA is mandated to take all appropriate actions to preserve and conserve Fannie's assets. 12 U.S.C. § 4617(b)(2)(D).  In connection with the conservatorship, Fannie entered into a senior preferred stock purchase agreement with the U.S. Department of the Treasury.  (¶ 415.)  This agreement allowed Fannie to borrow up to $200 billion to remain solvent.  (Id.)  With the public announcement of the FHFA conservatorship, Fannie's stock plummeted nearly 90%.  (¶ 20.)

While Fannie is congressionally chartered, it is also a publicly owned corporation and subject to the Securities Exchange Act of 1934 (the "Exchange Act").  Between August and October 2008, several securities class actions arising under the Securities Act of 1933 (the "1933 Act") and the Exchange Act were filed against Fannie and other defendants in both state and federal courts, including the Southern District of New York.  In October 2008, a putative Employee Retirement Income Security Act ("ERISA") class-action was filed.  The Judicial Panel on Multidistrict Litigation consolidated and transferred all of these cases to the Southern District of New York, including cases initially filed in state court and subsequently removed to federal

---

[2] The complaint differs on the dates surrounding this figure. In Paragraph 9, the complaint states that "[B]y December 2007, the Company had total subprime and Alt-A exposure of at least $405 billion. In Paragraph 76, however, the complaint states the same figure as referring to September 30, 2007.

court. In re Fannie Mae Securities and Employee Income Retirement Security Act (ERISA) Litigation, 598 F. Supp. 2d 1374 (J.P.M.L. 2009).

Plaintiffs bring this federal securities class action on behalf of themselves and a class of others similarly situated consisting of all persons and entities that, between November 8, 2006 and September 5, 2008 (the "Class Period"), purchased or otherwise acquired Fannie common stock (and/or options) or preferred stock, and were thereby allegedly damaged.

The Defendants in this action are Fannie, Fannie CEO Daniel H. Mudd ("Mudd"),[3] Fannie CFO Robert T. Blakely ("Blakely"),[4] Fannie CFO Stephen M. Swad ("Swad"),[5] Fannie CRO Enricho Dallavecchia ("Dallavecchia"),[6] and Fannie external auditor, Deloitte & Touche LLP ("Deloitte")[7] (Mudd, Swad, Blakely, and Dallavecchia collectively: the "Individual Defendants"; Fannie, the Individual Defendants, and Deloitte collectively: the "Defendants.").

On November 24, 2009, this Court granted Defendants' motion to dismiss claims against Fannie arising under the 1933 Act.  In re Fannie Mae 2008 Securities Litigation, 2009 WL 4067259 (S.D.N.Y. Nov. 24, 2009).  The remaining securities claims arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5 (the "Exchange Act Claims"). Specifically, Plaintiffs bring three Exchange Act Claims: (i) a claim against Fannie and the Individual Defendants for violations of Section 10(b)

---

[3] Mudd served as Fannie's CEO during the Class Period. (¶ 28.)

[4] Blakely served as Fannie's CFO and Executive Vice President during the Class Period until August 17, 2007. (¶ 29.)  Blakely has not answered or otherwise responded to the Complaint.

[5] Swad served as Fannie's CFO and Executive Vice President from August 2007 until August 28, 2008. (¶ 30.)

[6] Dallavecchia served as Fannie's CRO and Executive Vice President during the Class Period until August 2008. (¶ 31.)

[7] Deloitte served as Fannie's auditor during the Class Period, auditing Fannie's financial statements and management's report on the effectiveness of internal control over financial reporting for the years ended December 31, 2006 and 2007. (¶ 36.)

of the Exchange Act, 15 U.S.C. § 78j(b), and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5;[8] (ii) a

claim against Deloitte for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b),

and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5;[9] and (iii) a claim against the Individual Defendants

for control person liability under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

Plaintiffs principally allege that the Defendants intentionally or recklessly disregarded the

housing market's increasing volatility, continued to invest in risky subprime and Alt-A

mortgages, and materially misled investors as to: (i) the extent of Fannie's exposure to, and the

risks inherent in, the subprime and Alt-A mortgage markets and (ii) Fannie's ability to manage

the risks associated with these markets. Plaintiffs also allege that (iii) the Defendants violated the

Exchange Act by filing materially inaccurate financial statements within the Class Period, and

that, in connection with these financial statements, Deloitte violated generally accepted

accounting principles ("GAAP") and generally accepted auditing standards ("GAAS").

Defendants now move under Fed. R. Civ. P. 12(b)(6) to dismiss the Exchange Act

Claims. For the reasons that follow, the Defendants' motion is GRANTED IN PART and

DENIED IN PART.

## **GENERAL LEGAL STANDARDS**

### I. **General Motion to Dismiss Standard**

A pleading must "contain a short and plain statement of the claim showing that the

pleader is entitled to relief." Fed. R. Civ. P. 8(a). When considering a Fed. R. Civ. P. 12(b)(6)

motion, the court "must accept as true all of the factual allegations contained in the complaint,"

---

[8] Lead Plaintiffs bring this claim and allege that the Individual Defendants are liable for both false and misleading statements that they personally made as well as false and misleading statements contained within "group published information." (¶¶ 568-570.)

[9] This claim is brought only by Lead Plaintiffs Boston Retirement Board and Tennessee Consolidated Retirement System.

and construe the complaint in the light most favorable to the plaintiff.  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 572 (2007); see Ashcroft v. Iqbal, 129 S.Ct. 1937, 1950 (2009) ("When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.").

Allegations that are no more than legal conclusions, however, are not assumed to be true. See Iqbal, 129 S.Ct. at 1949. Dismissal of a complaint under Fed. R. Civ. P. 12(b)(6) is appropriate if the plaintiff has failed to offer factual allegations sufficient to render the asserted claim plausible on its face.  See id.  To state a facially plausible claim, a plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id.   "[T]he pleading standard Rule 8 announces does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." Id.  "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'"  Id. (citation omitted). While legal conclusions can form the framework of a complaint, they must be supported by factual allegations. See id.

In ruling on a motion to dismiss an action alleging securities fraud, courts must accept the complaint's allegations as true, Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007), and draw all reasonable inferences in the plaintiff's favor.  Caiola v. Citibank, N.A., 295 F.3d 312, 321 (2d Cir. 2002).  The court only "assess[es] the legal feasibility of the complaint"; it does not "assay the weight of the evidence which might be offered in support thereof." Levitt v. Bear Stearns & Co., 340 F.3d 94, 101 (2d Cir. 2003).

When deciding a motion to dismiss, a court may consider documents attached as exhibits to the complaint and documents incorporated into the complaint by reference, as well as "documents that are integral to the plaintiff's claims, even if not explicitly incorporated by reference, and matters of which judicial notice may be taken." In re Gildan Activewear, Inc. Sec. Litig., 636 F. Supp. 2d 261, 268 n.3 (S.D.N.Y. 2009); see also ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007); De Jesus v. Sears, Roebuck & Co., 87 F.3d 65, 69 (2d Cir. 1996).

## II.        Heightened Pleading Standards of Rule 9(b) and the PSLRA

Fed. R. Civ. P. 9(b) sets forth a heightened pleading requirement for complaints alleging fraud: "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake.  Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."  See In re Pfizer Inc. Sec. Litig., 584 F. Supp. 2d 621, 632–33 (S.D.N.Y. 2008).  This standard requires the plaintiff to "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." Stevelman v. Alias Research Inc., 174 F.3d 79, 84 (2d Cir. 1999).

In addition to the requirements of Fed. R. Civ. P. 8(a)(2) and 9(b), however, securities fraud claims under section 10(b) and Rule 10b-5 must also meet the heightened pleading standards set forth in the Private Securities Litigation Reform Act of 1995 ("PSLRA"). 15 U.S.C. § 78u-4(b).  Among other requirements, the PSLRA requires "plaintiffs to state with particularity both the facts constituting the alleged [securities fraud] violation" and the other elements of the 10(b) cause of action.  Tellabs, 551 U.S. at 313.  To effectuate Congress's intent to eliminate baseless lawsuits through the application of rigorous pleading standards, the PSLRA mandates

that a plaintiff alleging a section 10(b) action must: (1) specify each statement alleged to have been misleading and the reason or reasons why the statement is misleading, and (2) state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind. 15 U.S.C. § 78u-4(b)(1)-(2); Novak v. Kasaks, 216 F.3d 300, 306 (2d Cir. 2000).  A plaintiff alleging securities fraud under Rule 10b-5 must plead particular facts showing that a statement or omission was misleading at the time it was made.  Novak, 216 F.3d at 306, 309.

### III.    Elements of Claims under Section 10(b) and Rule 10b-5

Section 10(b) of the Exchange Act prohibits any person from using or employing "any manipulative or deceptive device or contrivance in contravention" of Securities and Exchange Commission ("SEC") rules. 15 U.S.C. § 78j(b).  Rule 10b-5, promulgated by the SEC under Section 10(b), prohibits "any device, scheme, or artifice to defraud" and "any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made . . . not misleading . . . ."  17 C.F.R. § 240.10b-5.  To state a claim under Rule 10b-5, plaintiffs must allege that defendants "(1) made misstatements or omissions of material fact; (2) with scienter; (3) in connection with the purchase or sale of securities; (4) upon which plaintiffs relied; and (5) that plaintiffs' reliance was the proximate cause of their injury."  Lentell v. Merrill Lynch & Co., 396 F.3d 161, 172 (2d Cir. 2005).

### IV.    Materiality and the Bespeaks Caution Doctrine

A complaint alleging a Rule 10b-5 claim fails if it relies on statements or omissions "that a reasonable investor would [not] have considered significant in making investment decisions."  Ganino v. Citizens Utils. Co., 228 F.3d 154, 161 (2d Cir. 2000).  There are two categories of statements that are immaterial and therefore cannot support a securities fraud claim.  The first

category includes "statements containing simple economic projections, expressions of optimism, and other puffery." Novak, 216 F.3d at 315.  The second category of immaterial statements are those that are accompanied by adequate cautionary language — this is known as the "bespeaks caution" doctrine.  Halperin v. eBanker USA.com, Inc., 295 F.3d 352, 357 (2d Cir 2002).

Specifically, "[t]he bespeaks caution doctrine allows courts to rule that a defendant's forward-looking representations contain enough cautionary language or risk disclosures to protect against claims of securities fraud." In re Prudential Sec. Inc. P'ships Litig., 930 F. Supp. 68, 72 (S.D.N.Y. 1996). The doctrine applies only to forward-looking statements, not representations of present or historical fact.  See Rombach v. Chang, 355 F.3d 164, 173 (2d Cir. 2004).  A plaintiff cannot state a claim by citing snippets of corporate disclosures and alleging it is misleading; rather, such disclosures must be "read as a whole." Halperin, 295 F.3d at 358. Moreover, "[t]he cautionary language must be specific, prominent, and must directly address the risk that plaintiffs claim was not disclosed." In re Flag Telecom Holdings, Ltd. Sec. Litig., 618 F. Supp. 2d 311, 322 (S.D.N.Y. 2009).  "If a party is aware of an actual danger or cause for concern, the party may not rely on a generic disclaimer in order to avoid liability." Edison Fund v. Cogent Inv. Strategies Fund, Ltd., 551 F. Supp. 2d 210, 226 (S.D.N.Y. 2008).

V.    **Scienter Pleading Standards in Fraud Claims**

A plaintiff claiming fraud can plead scienter "either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." Lerner v. Fleet Bank, N.A., 459 F.3d 273, 290–91 (2d Cir. 2006).  To satisfy Rule 9(b), a plaintiff asserting common law fraud must allege "facts that give rise to a strong inference of fraudulent intent." Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1128 (2d Cir. 1994).  "Although

speculation and conclusory allegations will not suffice, neither do we require 'great specificity'
provided the plaintiff alleges enough facts to support 'a strong inference of fraudulent intent.'"
Ganino, 228 F.3d at 169.

In considering whether the facts as pleaded give rise to a strong inference of fraudulent
intent, courts must "consider plausible nonculpable explanations for the defendant's conduct, as
well as inferences favoring the plaintiff."  Tellabs, 551 U.S. at 323–24.  Thus, "[a] complaint will
survive . . . only if a reasonable person would deem the inference of scienter cogent and at least
as compelling as any opposing inferences one could draw from the facts alleged."  Id.

While personal interest is sufficient to establish motive, see Rombach, 355 F.3d at 177, a
defendant's general desire to earn management fees is insufficient to satisfy Rule 9(b).  Edison
Fund, 551 F. Supp. 2d at 227 ("The desire to earn management fees is a motive generally
possessed by hedge fund managers, and as such, does not suffice to allege a 'concrete and
personal benefit' resulting from fraud."); see id. ("Motive may be pleaded adequately where the
defendants are alleged to have benefited in 'some concrete and personal way.'").  Further,
generalized allegations of a defendant's desire to maintain the appearance of corporate
profitability or the success of an investment do not satisfy the motive prong of a Rule 9(b) claim.
See In re JP Morgan Chase Sec. Litig., 363 F. Supp. 2d 595, 621 (S.D.N.Y. 2005) ("Generalized
allegations of intent to maintain lucrative business relationships and to establish new ones do not
set forth a motive for scienter purposes.").

Recklessness sufficient to establish scienter involves conduct that is "highly unreasonable
and . . . represents an extreme departure from the standards of ordinary care."  Chill v. Gen. Elec.
Co., 101 F.3d 263, 269 (2d Cir. 1996).  The allegations must approximate an actual intent to
defraud.  Id.  Where a "motive is not apparent . . . , the strength of the circumstantial allegations

must be correspondingly greater."  In re Take-Two Interactive Sec. Litig., 551 F. Supp. 2d 247, 270 (S.D.N.Y. 2008).  "Thus, a plaintiff pleading a § 10(b) violation based on defendant's recklessness faces two stiff challenges in this Circuit: the strength of the recklessness allegations must be greater than that of allegations of garden-variety fraud, *and* the inference of recklessness must be at least as compelling as any opposing inferences."  In re Bayou Hedge Fund Litig., 534 F. Supp. 2d 405, 415 (S.D.N.Y. 2007).

## VI.    Loss Causation

"Loss causation" — a concept analogous to the common law concept of "proximate cause" — must be sufficiently alleged in order to sustain a successful fraud claim under Rules 10(b) and 10b-5.  In order to successfully allege loss causation, a plaintiff must adequately plead facts which, if proven, would show that its loss was caused by the fraud and not by other intervening events.  Lentell, 396 F.3d at 174; see also 15 U.S.C. § 78u-4(b)(4) ("[i]n any private action arising under this chapter, the plaintiff shall have the burden of proving that the act or omission of the defendant alleged to violate this chapter caused the loss for which the plaintiff seeks to recover damages"); Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc., 343 F.3d 189, 197 (2d Cir. 2003).

Where a "plaintiff's loss coincides with a marketwide phenomenon causing comparable losses to other investors, the prospect that the plaintiff's loss was caused by the fraud decreases," making it more difficult for a plaintiff to establish loss causation.  Lentell, 396 F.3d at 173.  To survive a motion to dismiss, however, a plaintiff must only allege either: "(i) facts sufficient to support an inference that it was a defendant's fraud — rather than other salient factors — that proximately caused plaintiff's loss," id. at 177, or (ii) "facts that would allow a factfinder to ascribe some rough proportion of the whole loss to . . . [the defendant's fraud]."  Lattanzio v.

Deloitte & Touche LLP, 476 F.3d 147, 158 (2d Cir. 2007).

## ANALYSIS

Plaintiffs' Exchange Act allegations fall into three principal categories.  Specifically, Plaintiffs allege that the Defendants knowingly or recklessly (I) materially misrepresented the extent of Fannie's exposure to the subprime and Alt-A mortgage markets and its related risks, including misrepresenting their underwriting standards as well as the geographic concentrations of Fannie's subprime and Alt-A investments; (II) materially misrepresented the quality of Fannie's internal risk management and controls; and (III) filed materially inaccurate financial statements that misrepresented Fannie's Core Capital and that, in connection with these financial statements, Deloitte violated GAAP and GAAS.

## I.   Fannie's Subprime and Alt-A Risk Exposure and Related Risks

In the mid-2000s, the mortgage market expanded into high-risk, non-prime mortgages. Traditionally conservative in its investments, these market-wide developments caused Fannie to reassess its investment strategy.  According to an internal Fannie presentation dated June 27, 2005 (the "June 2005 Presentation"), Fannie considered whether it should "stay the course" by continuing to focus on low-risk, traditional, 30-year fixed-rate mortgages, or "meet the market" by focusing on high-risk, non-prime mortgage loans.  (¶¶ 6, 69.)  The June 2005 Presentation noted that Fannie was not prepared to meet the market since it lacked "capabilities and infrastructure" as well as "knowledge of the credit risks."  (¶¶ 7, 67.)

As the market expanded into high-risk mortgages, Fannie came under increasing pressure to assume more risk.  In late 2004 or early 2005, Countrywide Financial ("Countrywide"), Fannie's largest customer, threatened to sell its loans to other companies rather than Fannie,

unless Fannie bought a larger share of its high-risk loans.  (¶ 5.)  Countrywide warned Fannie that it was becoming "irrelevant" by failing to invest in high-risk mortgage loans and MBSs.  (¶ 64.)

In response to these market developments and client pressures, Fannie changed its book of business and underwriting practices during late 2005 and early 2006.  (¶¶ 72–73.)  Fannie decided to "meet the market" and focus on high-risk mortgage loans notwithstanding its lack of capacity to manage the risks associated with subprime and Alt-A mortgages, according to an internal Fannie report dated July 7, 2006 (the "July 2006 Report").  (¶ 71.)  To that end, Fannie expanded its share of the Alt-A market from $187 billion at the end of 2005, to $276 billion in 2006, and to $350.6 billion by year-end 2007.  (¶ 75.)  As of late 2007, Fannie's combined subprime and Alt-A credit risk exposure was $405 billion, equal to 45% of Fannie's total assets.  (¶ 76.)[10]

### a. Plaintiffs Allege that Fannie Misrepresented its Exposure to the Subprime and Alt-A Mortgage Markets and the Related Risks of Such Exposure

Plaintiffs allege that Fannie failed to disclose its new investment strategy and misrepresented the extent of its exposure to the subprime and Alt-A markets and its related risks. For example, the Complaint alleges that Fannie failed to inform investors that by the end of 2006, Fannie had $345 billion exposure to subprime and Alt-A mortgages and that by late 2007, Fannie had a total subprime and Alt-A exposure of at least $405 billion.  (¶¶ 9, 76.)[11]

---

[10] The complaint differs on the dates surrounding this figure. In Paragraph 9, the complaint states that "[B]y December 2007, the Company had total subprime and Alt-A exposure of at least $405 billion. In Paragraph 76, however, the complaint states the same figure as referring to September 30, 2007.

[11] The complaint differs on the dates surrounding this figure. In Paragraph 9, the complaint states that "[B]y December 2007, the Company had total subprime and Alt-A exposure of at least $405 billion. In Paragraph 76, however, the complaint states the same figure as referring to September 30, 2007.

The Complaint points to several public statements by either Fannie or the Individual Defendants indicating that Fannie's exposure to the subprime and Alt-A markets was limited and that the credit characteristics of Fannie's subprime and Alt-A profile were strong.  (¶¶ 74, 78, 82, 189, 191, 194, 204, 206, 212.)  For example, during a conference call on February 27, 2007, Mudd told investors that Fannie has "a book of business with very strong credit risk characteristics . . . .  [O]ur exposures to some of the high-risk segments are extremely low for subprime . . . ." (¶ 78); that Fannie does not "have so much [Alt-A loans] that this is a major, significant exposure on our books" (¶¶ 74, 191); and that "I want to emphasize . . . through all of this that Fannie Mae is in a good position. . . ." (¶ 189).  Similarly, in March, 2007, Mudd testified before Congress that "[w]e said a couple of years ago that this [subprime] market was evolving in a direction that we didn't like," and that "[w]e stepped away from it."  (¶ 194.)

On May 2, 2007, Defendants stated that, as of December 31, 2006, approximately 2% of Fannie's single-family mortgage credit book of business was subprime.  (¶ 82.)  Mudd stated that the "important characterization of all of our efforts with respect to subprime and Alt-A . . . is that we stood back from the market.  We adhered to our standards. . . ." (¶ 204.)  Additionally, Dallavecchia stated that "[o]n average, the credit characteristics of our Alt-A portfolio is comparable to the conventional book of business that we have."  (¶¶ 82, 206.)

On August 16, 2007, Fannie issued a news release concerning its financial results for 2006.  (¶ 212.)  The news release quoted Mudd as stating that "[w]e made a decision several years ago to step back from the riskier margins of the mortgage market. . . . [W]e believe Fannie Mae is well positioned to weather the turmoil in the mortgage market. . . .  Though the housing market continues to cool in 2007 and the credit environment remains challenging, I believe Fannie Mae is well situated for the future . . . .  Strategic decisions we made in the past several

years — particularly with respect to our discipline in the non-traditional parts of the mortgage finance market — have positioned us to do well as the housing market stabilizes. . . ."  (Id.)

Fannie's entry into the high-risk mortgage market increased Fannie's investments in states with high foreclosure rates, including California, Florida, Nevada, and Arizona.  (¶¶ 119–21.)  The Complaint alleges that Fannie failed to disclose that its book of business had concentrations in these high-risk geographic areas.  (¶¶ 121, 202.)

**b. Plaintiffs Fail to Adequately Plead Material Misrepresentations Regarding Fannie's Exposure to Subprime and Alt-A Mortgage Markets**

Plaintiffs' allegations regarding material misrepresentations as to Fannie's subprime and Alt-A risk exposure fail for three independent reasons: (i) Fannie's public filings contained cautionary language that warned investors about the risks of Fannie's subprime and Alt-A mortgage investments; (ii) Plaintiffs fail to explain why the statements of Fannie or the Individual Defendants regarding Fannie's subprime and Alt-A investments were false; and (iii) Plaintiffs fail to adequately plead that either Fannie or the Individual Defendants acted with scienter in making statements about Fannie's subprime and Alt-A risk exposure.

*i.    Fannie's Public Filings Contained Cautionary Language Warning Investors About the Risks of Fannie's Subprime and Alt-A Mortgage Investments*

Contrary to Plaintiffs' assertions, Fannie's yearly statements contained language expressly disclosing their increased activity in the subprime markets throughout the class period and in the years preceding it.  For example:

- 2004 Form 10-K.  Fannie Mae disclosed that "due to the current competitive dynamics of the mortgage market, we have recently increased our purchase and securitization of mortgage loans that pose a higher credit risk. . . .  We also have increased the proportion of reduced documentation loans that we purchase or that back our Fannie Mae MBS. . . .  The increase in our exposure to credit risk resulting from the increase in these loans with higher credit risk may cause us to

experience increased delinquencies and credit losses in the future, which could adversely affect our financial condition. . . ."  (Fannie Ex. 5, 2004 Form 10-K, at 43 (filed Dec. 6, 2006).)

- 2005 Form NT 10-K.  Fannie disclosed that it was "working to increase the level of [its] involvement in the subprime market . . . ."  (Fannie Ex. 19, 2005 Form NT 10-K, at 16 (filed Mar. 13, 2006).)

- November 8, 2006 Form NT 10-Q.  "We have increased our participation in [Alt-A and subprime] types of products where we have concluded that it would be economically advantageous or that it would contribute to our mission objectives.  Our participation in these products reflects our assessment of anticipated guaranty fee income in light of our expectation for potentially higher credit losses."  (¶ 173 (quoting Nov. 8, 2006 NT 10-Q).)

- 2006 Form 10-K.  Fannie disclosed that "[t]he proportion of higher risk mortgage loans that were originated in the market between 2003 and mid-2006 increased significantly.  As a result, our purchase and securitization of loans that pose a higher credit risk . . . also increased, although to a lesser degree than many other institutions."  (Fannie Ex. 3, 2006 Form 10-K, at 23 (filed Aug. 16, 2007).)

- 2007 Form 10-K.  Fannie noted that "rapid increases" in delinquencies and losses on loans, many of which "were originated in 2006 and the first half of 2007." (Fannie Ex. 10, 2007 Form 10-K, at 24 (filed Feb. 27, 2008).)

- 2007 1st Quarter 10-Q.  Fannie disclosed, *inter alia*, that "[a]s of March 31, 2007, we estimate that approximately 11% of our total single-family mortgage credit book of business consisted of Alt-A mortgage loans." (2007 1st Quarter Form 10-Q, at 40 (filed Nov. 9, 2007).

Further, Fannie disclosed in their 2006 Annual Report that:

We estimate that, as of June 30, 2007, subprime mortgage loans or structured Fannie Mae MBS backed by subprime mortgage loans represented approximately 0.2% of our single-family mortgage credit book of business.  As of June 30, 2007, we had invested in private-label securities backed by subprime mortgage loans totaling $47.2 billion, which represented approximately 2% of our single-family mortgage credit book of business.

      *       *       *

12% and 11% of our single-family mortgage credit book of business as of June 30, 2007 and December 31, 2006 respectively, consisted of Alt-A mortgage loans or structured Fannie Mae MBS backed by Alt-A mortgage loans, and approximately 1% of our single-family mortgage credit book of business consisted of private-label mortgage-related securities backed by Alt-A mortgage loans . . . as of both June 30, 2007 and December 31, 2006.

(¶ 226.)  Fannie's 2007 10-K also noted specifically that subprime loans made up less than 1% of its single-family business volume in 2007, 2006, and 2005. (¶ 334.)

Such statements undermine the contention that Fannie failed to disclose the extent of their increased activities in the subprime markets.  Not only were Fannie's disclosures explicit, but Plaintiffs cite these disclosures in their complaint.  When a plaintiff concedes the existence of statements that disclose the information that the plaintiff had previously alleged had been withheld, such "non-disclosures" cannot support a securities fraud claim.  Stated differently, "Plaintiffs cannot base their claims on an inference drawn from disclosure[s] in one document . . . if that inference contradicts more specific disclosure[s] in another document." Sable v. Southmark/Envicon Capital Corp., 819 F. Supp. 324, 334 (S.D.N.Y. 1993); see also In re Nokia Corp. Sec. Litig., No. 96 CIV. 3752(DC), 1998 WL 150963, at *9–10 (S.D.N.Y. April 1, 1998) ("non-omissions" — such as information conceded to exist by plaintiffs — cannot support a securities fraud claim).

Moreover, Fannie made several disclosures during the class period explicitly delineating the risks that increased involvement in the subprime markets posed to the company.  Plaintiffs' underlying material concern with Fannie's alleged misrepresentations is presumably that investors could not properly gauge the degree of risk that Fannie's subprime and Alt-A investments represented to them.  Fannie repeatedly disclosed, however, that it was subject to fluctuations in the subprime and Alt-A markets.  For example:

- 2005 Form 10-K.  "Declines in housing prices could result in increased delinquencies or defaults on the mortgage loans we own or that back our guaranteed Fannie Mae MBS."  (Fannie Ex. 7, 2005 Form 10-K, at 47 (filed May 2, 2007).)

- 2007 3rd Quarter 10-Q.  "We are in the midst of a significant correction in housing and mortgage markets.  The market downturn that began in 2006 has continued through the first three quarters of 2007, with substantial declines in new

and existing home sales, housing starts, mortgage originations, and home prices . . . . We expect these factors will continue to affect our financial condition and results of operations through the end of 2007 and into 2008." (Fannie Ex. 8, 2007 3rd Quarter Form 10-Q, at 5 (filed Nov. 9, 2007); <u>see</u> <u>also</u> Fannie Ex. 9, FY 2006 Earnings Call, at 4 (Aug. 16, 2007) ("This is clearly a market poised for most severe overall credit losses in the near to intermediate term.").)

- <u>2007 Form 10-K.</u>  "Mortgage and housing market conditions, which significantly affect our business and financial performance, worsened progressively throughout 2007. . . . These challenging market and economic conditions caused a material increase in mortgage delinquencies and foreclosures during 2007.  The credit performance of subprime and Alt-A loans, as well as other higher risk loans, has deteriorated sharply . . . ." (Fannie Ex. 10, 2007 Form 10-K, at 2 (filed Feb. 27, 2008).)[12]

Plaintiffs' argument that Fannie understated their degree of exposure to the subprime markets — and the risks this entailed — is clearly contradicted by these statements. Additionally, Fannie's regulator, the Office of Federal Housing Enterprise Oversight ("OFHEO"), disclosed to Congress in 2006 that Fannie had expanded its "investment and guarantee activities in the subprime and nontraditional mortgage sectors" (Fannie Ex. 20, at 38); and, in 2007, that "[h]igher-risk products such as interest-only, sub-prime, Alt-A and negative amortization loans are growing" (Fannie Ex. 21, at 24).

Plaintiffs also argue that Fannie disclosed its concentrations of loans in Florida, Nevada, and Arizona too late into the class period and thus, for a time, "falsely represented" that it did not have any significant concentrations of loans in those states.  (Pl. Mem. 21–22.)  The Complaint and the documents cited, however, demonstrate the opposite. Fannie routinely disclosed its mortgage holdings by region in every Form 10-K filed during the class period.[13]  (<u>See</u>, <u>e.g.</u>, Fannie Ex. 5, 2004 Form 10-K, at 141 (disclosing "Geographic concentration" by region and year); Fannie Ex. 7, 2005 Form 10-K, at F-76 (same); Fannie Ex. 3, 2006 Form 10-K, at 131

---

[12] The public statements cited by Plaintiffs also include extensive charts denoting Fannie's risk-exposure.

[13] These regions are Midwest, Northeast, Southeast, Southwest, and West.

(same); Fannie Ex. 10, 2007 Form 10-K, at 127 (same).)  Fannie explained to investors the risks associated with its regional holdings, when, for example, it announced that "a large part of [Fannie Mae's] Alt-A book is in the states that have experienced the largest home price declines throughout the country."  (Fannie Ex. 32, Q2 2008 Earnings Call, at 7.)  Plaintiffs have not alleged particularized facts showing that Fannie Mae either (1) intentionally sought to mislead investors by providing a regional breakdown (see, e.g., Fannie Ex. 10, 2007 Form 10-K, at 24, 127 (filed Feb. 27, 2008)) or (2) was required to have singled out Florida, Nevada, and Arizona for specific mention.  Without such facts, Plaintiffs succeed in pleading only that more could have been disclosed.  This sort of "fraud by hindsight" has consistently been rejected by the Second Circuit.  See Novak, 216 F.3d at 309; Stevelman, 174 F.3d at 85.

ii.    *Plaintiffs Fail to Adequately Plead a Material Misstatement*

Plaintiffs fail to adequately explain, as required by Rule 9(b), why the Defendants' statements regarding Fannie's subprime and Alt-A mortgage investments were fraudulent.  See Stevelman, 174 F.3d at 84.  Though Plaintiffs allege that Fannie materially misrepresented its exposure to subprime and Alt-A mortgage markets, they do not dispute that Fannie invested principally in low-risk subprime and Alt-A securities.  Specifically, Plaintiffs do not dispute that: (i) Fannie focused its subprime investments in the highest-rated tranches of these securities (¶ 209); (ii) as of November 8, 2007, all of Fannie's private-label mortgage-related securities backed by Alt-A mortgage loans were rated AAA (high investment grade) (¶¶ 269, 334); and (iii) the majority of Fannie's Alt-A portfolio was comprised of safer fixed-rate — not floating rate — mortgages.  (¶ 206.)  Moreover, Plaintiffs do not dispute that subprime and Alt-A mortgages represented a small percentage of Fannie's overall mortgage book of business: subprime mortgages represented less than 1% of Fannie's single-family business volume during

2005–2007, and Alt-A mortgages represented approximately 12% of Fannie's total single-family mortgage credit book of business as of December 31, 2007; 11% of Fannie's total single-family mortgage credit book of business as of December 31, 2006; and 8% of Fannie's total single-family mortgage credit book of business as of December 31, 2005.  (¶ 334.)  Since Plaintiffs do not dispute that Fannie invested principally in low-risk subprime and Alt-A securities, Plaintiffs fail to meet the pleading requirements of Rule 9(b).

iii.   *Plaintiffs Fail to Allege that Defendants Acted with Scienter*

The Complaint alleges that the Defendants made these "misstatements" or "omissions" regarding Fannie's limited subprime and Alt-A risk exposure knowingly or recklessly disregarding the true extent of the risks and, therefore, with scienter.  Specifically, the Complaint alleges that in January 2007, Eric Rosenblatt, a Vice President of Credit Risk for Fannie's Single Family business ("Rosenblatt"), began producing a Comprehensive Credit Risk Assessment Report (the "Risk Report") that reviewed Fannie's overall credit risk.  (¶ 94.)  According to a confidential witness, a former Fannie risk modeler and Director of Risk Management in the Business Analytics division ("Confidential Witness #2"), the Risk Report was updated monthly and distributed to "anyone in [the] Single Family business or credit," including senior executives, such as the Individual Defendants.  (¶¶ 91, 94.)  According to Confidential Witness #2, by August 2007, the Risk Report's loss projections made Fannie's Credit Risk department "very worried" about the risks of Alt-A loans.  (¶ 94.)

In addition, in January 2007, Rosenblatt assigned a team to build a home price model forecast, resulting in a Power Point document completed in January 2007 called the "Home Price Forecasting Report."  (¶ 95.)  The Report predicted that home prices would decline dramatically since the national income was below the levels necessary to sustain the current housing market,

and projected a 50% drop in home prices over the next three to five years.  (Id.)  Based on this

forecast, Fannie anticipated "over a billion dollars — up from $300 to $400 million dollars — in

losses."  (Id.)  Similarly, another confidential witness ("Confidential Witness #3"), a Senior

Business Manager in Fannie's Enterprise Risk Services department, recalled that by late 2006,

Fannie had produced internal reports warning of declining home prices and increased loan

delinquency rates.  (¶ 96.)

      Plaintiffs claim that Fannie, in an effort to appease Countrywide, withheld this

information from investors in order to "sneak" riskier-than-disclosed mortgages past investors,

thereby allowing Fannie to retain Countrywide's business, and thus, allowing the Individual

Defendants to be rewarded with abnormally large bonuses.  (See ¶ 5–13.)  But "[t]he desire to

earn management fees is a motive generally possessed by . . . managers, and as such, does not

suffice to allege a 'concrete and personal benefit' resulting from fraud."  Edison Fund, 551 F.

Supp. 2d at 227.  There is no additional motive alleged by the Plaintiffs, save that Mudd and

Dallavecchia — who purchased Fannie's stock during the class period — may have been hoping

that their "fraud" would go undetected and Fannie's stock would thereby remain artificially

inflated.  This argument, however, is self-defeating.  Neither Mudd nor Dallavecchia sold their

stock prior to Fannie's collapse.  This fact either suggests that Mudd and Dallavecchia were

unaware of the aforementioned information (which would defeat Plaintiffs' "reckless scienter"

argument) or it suggests that Mudd and Dallavecchia legitimately believed in Fannie's financial

health in spite of the reports. They thus lacked either the opportunity (knowledge of a pending

drop in Fannie's stock prices) or the motive (Mudd and Dallavecchia's financial interests were

aligned with those of the investors) to defraud investors.

The same holds true for Swad and Blakely.  Plaintiffs claim that, other than managerial bonuses, these Defendants' "concrete and personal" benefit came in the form of stock packages. (Pl. Mem. 74.)  There are no allegations that these Defendants sold off their stock prior to Fannie's collapse. Accordingly, there is no additional allegation of "motive scienter," other than bonuses, which are insufficient.

As to whether Fannie acted recklessly, Fannie's alleged failure to disclose the degree of relaxation with respect to its underwriting standards is not an "extreme departure from the standards of ordinary care." Chill, 101 F.3d at 269.  Fannie made several specific disclosures concerning their entry into the subprime markets as described above, see supra p. 15, a necessary implication of which would be a change or redirection in their underwriting standards.  Far from signifying a departure from proper behavior, Fannie's actions in this case seem cautious, and their disclosures do not provide a compelling inference of fraud.  Where a defendant's disclosures are only misleading by virtue of a lack of particularity, and where a motive is absent, an inference of fraud sufficient to satisfy the PSLRA and Rule 9(b) is lacking.  As such, with respect to Fannie's failure to disclose the extent to which they had entered the subprime and Alt-A mortgage markets, Plaintiffs fail to adequately plead sufficient scienter.

## II.   Fannie's Internal Risk Management and Controls

### a.  Plaintiffs Allege that Fannie was not Equipped to Evaluate the Risks of Subprime and Alt-A Mortgages

The Complaint alleges that Fannie did not have the risk and control management infrastructure necessary to properly assess the risks of subprime and Alt-A mortgages, but misinformed the market that they had such safeguards in place.  In October 2008, Marc Gott, a former director in Fannie's loan servicing department, told The New York Times, "We [Fannie]

didn't really know what we were buying . . . . This system was designed for plain vanilla loans and we were trying to push chocolate sundaes through the gears." (¶ 8.) Similarly, Confidential Witness #2 stated that from May 1993 until August 2007, Fannie lacked evaluation models to analyze subprime mortgage pools; instead, Fannie relied on ratings issued by ratings agencies, such as Moody's.[14] (¶¶ 91–92.) On September 23, 2008, following the FHFA's conservatorship of Fannie, FHFA director Lockhart reported to Congress that "the credit profile at [Fannie] followed the market down in 2006 and 2007 — without commensurate pricing for risk." (¶ 105.)

Some of Fannie's filings also indicate that Fannie's internal risk and controls were inadequate. For example, Fannie's 2004 10-K states, "We did not maintain a properly staffed, comprehensive and independent risk oversight function. Specifically, our risk oversight function lacked enterprise-wide coordination, dedicated senior leadership and sufficient staffing. Comprehensive risk policies did not exist, and existing policies applicable to each business unit required enhancement." (Fannie Ex. 5, 2004 Form 10-K, at 200 (filed Dec. 6, 2006).) Similarly, Fannie's 2005 10-K states, "We did not maintain a properly staffed, comprehensive and independent risk oversight function." (Fannie Ex. 7, 2005 Form 10-K, at 182 (filed May 2, 2007).)

In addition to alleging that Fannie's internal risk management and controls were inadequate, the Complaint alleges that Fannie failed to adequately monitor the underwriting by the lenders from which it acquired mortgage loans (¶¶ 106–18) and that Fannie failed to seek appropriate protection, such as increasing its guarantee fees, for its enhanced risks (¶¶ 104–05). Fannie's entry into the high-risk mortgage market also necessitated that Fannie lower its own underwriting standards for the quality of loans it would accept. (¶¶ 106-09.)

---

[14] This allegation appears to indicate that Fannie entered the subprime mortgage market much earlier than the rest of the allegations suggest.

**b.  Materiality of Fannie's Misstatements or Omissions Regarding Internal Risk Management and Controls**

Some of Fannie's public statements regarding its risk management are as follows:

- <u>2006 Form NT 10-Q.</u> In its November 8, 2006 Form NT 10-Q, Fannie stated, "We believe that our assessment and approach to the management of credit risk continued to contribute in the third quarter of 2006 to the maintenance of a credit book of business with strong credit characteristics."  (¶¶ 77, 173.)

- <u>2007 Form NT 10-K.</u> Similarly, on February 27, 2007, Fannie issued a Form NT 10-K stating that, in conjunction with Fannie's increased participation in the subprime and Alt-A markets, Fannie "continue[d] to closely monitor credit risk." (¶ 182.)  On the same day, Mudd and Dallavecchia held a conference call during which Mudd told investors that "[w]ith the creation of the [Chief Risk Officer] position and the CRO office also came an appropriate set of processes and controls . . . that involved a process of setting standards and setting limits."  (¶ 191)  During the same conference call, Dallavecchia stated that in assessing participation in the subprime market, Fannie developed parameters "to carefully calibrate exposure to layered risk," and that he "believe[d] that [Fannie's] activity in the subprime market represent[ed] an appropriate and prudent engagement."  (¶ 184.)

- <u>2005 Annual Report.</u> Shortly thereafter, on May 2, 2007, Fannie issued its 2005 Annual Report, which stated that "[w]e have worked to enhance our credit analytics and data to better understand, assess and price for the risks associated with these products to allow us to closely monitor credit risk and pricing dynamics across the full spectrum of mortgage product types."  (¶¶ 197–98.)

- <u>Mudd Testimony Before Congress.</u> On September 20, 2007, Mudd testified before Congress that Fannie could "provide more liquidity help to the home finance market today without taking risks we are not capable of managing," and that Fannie had "vastly reduced [its] material control weaknesses."  (¶ 101.)

Plaintiffs cite three emails written by Dallavecchia that highlight the alleged misstatements and show that Fannie may have been saying one thing while believing another.  In the first, from October 28, 2006, Dallavecchia complained to Mudd that "[he had] a seri[ous] problem with the control process around subprime limits" and that "[t]here is a pattern emerging of inadequate regard for the control process."  (¶ 89.)  Then, on July 16, 2007, Dallavecchia complained to Fannie's Chief Operating Officer, Michael Williams, that "[Fannie] has one of the

weakest control processes I [have] ever witness[ed] in my career . . . . This company really doesn't get it, we are not even current and we are already back to the old days of scraping on controls and people."  (¶ 99.)  That same day, Dallavecchia forwarded to Mudd the email that he had sent to Williams and further stated, in part, the following:

> In a nutshell, I am very upset as I had to stand at the Board meeting today and hear that we have the will and money to change our culture and support taking more credit risk.
>
> *     *     *
>
> It was inappropriate what was said today to the Board as if I had all the necessary means and budget to act on the strategic plan. I do not even think that with what I was given for 2008 is adequate for the current risk, considering how far we already are from adequate market practices.
>
> *     *     *
>
> I have been saying that we are not even close to hav[ing] proper control processes for credit, market and operational risk.

(¶ 100.)

In December 2008, Mudd told Congress that he understood Dallavecchia's 2006 email to mean that Fannie was "ramping up too quickly on the subprime purchases and this acceleration prevented [Dallavecchia] from determining appropriate risk limits."  (¶ 90.)  Mudd also confirmed the email to mean that Dallavecchia "believed that [Fannie was] rushing into billions of dollars worth of subprime loan purchases without really knowing what [it] was doing"; and that "if the control processes [we]re not in proper working order, it prevent[ed] [Fannie] from following a rational decision-making model."  (Id.)

Given these statements, Plaintiffs' allegations of Defendants' misstatements to the market are sufficient to survive a motion to dismiss.  Defendants argue that statements in the 2004 and 2005 Forms 10-K cautioned investors as to Fannie's weaknesses with respect to risk management, but these documents supposedly reflected Fannie's condition during 2004 and

2005, and not Fannie's condition when the documents were filed.  In addition, even assuming

that the 2004 and 2005 10-Ks reflected Fannie's position at the time they were filed with respect

to risk management, the emails discussed above were sent around the same time as the

aforementioned statements that described a strong risk-management program. As a result,

Defendants' statements to the market were inconsistent at best and perhaps worse, but the

allegations are sufficient to survive Defendants' motion to dismiss.

### c.   Plaintiffs Sufficiently Plead Scienter With Respect to Statements Regarding Fannie's Internal Risk Management and Controls

To establish scienter under 10(b) and 10b-5, a plaintiff can allege either (a) motive and

opportunity or (b) conscious misbehavior or recklessness on the part of the defendant.  Lerner,

459 F.3d at 290–91.  While Plaintiffs' "motive and opportunity" allegation fails for the same

reason here as it does in previous sections — they fail to plead any specific motivation —

Plaintiffs' allegation of recklessness is sufficient to survive Defendants' motion to dismiss.

Dallavecchia's emails suggest that Fannie was conscious of its internal inability to

manage the risks associated with subprime loans.  Proceeding headlong into an unfamiliar

market and telling investors that risk controls are in place while working, according to

Dallavecchia's emails, without the internal ability to analyze the risks associated with that

market is certainly enough of "an extreme departure from the standards of ordinary care" to

show an inference of scienter and therefore survive a motion to dismiss.  See Chill, 101 F.3d at

269.

Further, the inference of recklessness here is greater than that of "garden-variety fraud,"

and Plaintiffs' allegation of recklessness is at least as compelling as any other inference.  See

Bayou Hedge Fund, 534 F. Supp. 2d at 415.  Defendants suggested at oral argument that

26

Dallavecchia's 2007 emails were simply a reaction to proposed budget cuts that refer broadly to all aspects of Fannie's risk profile, and was not limited to subprime and Alt-A exposure, and that Dallavecchia's 2006 email refers solely to a theoretical fear that Fannie will exceed a certain subprime limit.  At the pleading stage, however, these explanations are not *more* compelling than Plaintiffs' suggestion that these emails reflect a pertinent concern with Fannie's risk exposure to the subprime markets.  See Bayou Hedge Fund, 534 F. Supp. 2d at 415.  Accordingly, Plaintiffs adequately allege scienter with respect to these allegations.

### III.    Fannie's Financial Statements

### a.  Fannie's Financial Reporting Requirements

The Complaint alleges that Fannie's financial statements materially misstated the amount of Fannie's Core Capital and concealed Fannie's failure to meet its Core Capital requirements. (¶¶ 134–69.)  "Core Capital" is a key metric of Fannie's financial health and consists of the sum of Fannie's outstanding common stock and certain preferred stock, paid-in capital, and retained earnings.  (¶ 46.)  Federal law requires Fannie to maintain certain minimum levels of Core Capital.  (¶¶ 46, 138–39.)  Fannie's ability to meet its Core Capital was a measure closely followed by investors and was vital to Fannie's continuation as a publicly traded company.  (¶ 47.)

According to the Complaint, Fannie misrepresented its Core Capital by violating GAAP. Specifically, Plaintiffs allege that, starting with Fannie's 2006 10-K filed in August 2007, every one of Fannie's financial statements for the Class Period (1) overstated Fannie's deferred tax assets ("DTAs"),[15] (2) understated Fannie's other-than-temporary impairments ("OTTI") to the

---

[15] DTAs may be used to reduce subsequent periods' income tax expenses and can arise in years in which a company incurs losses.  (¶ 158.)  DTAs have no value unless it was more likely than not that Fannie would generate a profit and pay taxes.  (¶ 159.)  If Fannie incurred future losses, there would be no income tax expense for the deferred tax

fair value of its "available-for-sale" assets,[16] and/or (3) understated Fannie's loan loss reserves.[17] (¶¶ 134–69.)  To support their allegations, Plaintiffs rely mainly on: (i) the timing of the large write-downs occurring after Fannie entered conservatorship (¶ 551); and (ii) the "Home Price Forecasting Report" dated January 2007 that allegedly predicted a 50% decline in the market over three to five years.  (¶ 440.)

In addition, the Complaint alleges that Fannie's 2006 and 2007 10-Ks contained misleading audit reports that falsely stated that the accompanying financial statements were made in compliance with GAAP.  (¶¶ 36, 233, 475–76, 496.)  Deloitte provided unqualified opinions on Fannie's consolidated financial statements in Fannie's Forms 10-K for 2006 and 2007; in the 2007 Form 10-K, Deloitte also provided an unqualified opinion on the effectiveness of Fannie's internal control over financial reporting.  (¶ 36.)  In sum, Plaintiffs allege that Deloitte did not perform its audits of Fannie's financial statements in accordance with GAAS and that Deloitte presented Fannie's financial statements in a manner which violated GAAP.  (¶¶ 423–520.)

---

assets to reduce and the assets could not be utilized.  (Id.)  To the extent that it was "more likely than not" that Fannie would not generate enough taxable earnings to use its DTAs, GAAP required that Fannie record a reserve account called a "valuation allowance" to reduce the size of those assets on its balance sheet.  (¶ 160.)

[16] "Available-for-sale" securities are those held neither principally for the purpose of trading in the near term nor with the intention of holding them to maturity.  (¶ 151.)  Unlike declines in the fair value of other types of securities, declines in the fair value of available-for-sale assets need not be reported on Fannie's income statement unless they have become OTTI.  (¶ 152.)  According to Fannie's 10-Ks, a security was considered to be OTTI if it suffered a decline in fair value to below its amortized cost (the value at which it is listed on the balance sheet) and if Fannie determined that there was no prospect for an imminent recovery of value).  (¶ 453.)

[17] Loan loss reserves are reserves of capital that Fannie sets aside to absorb estimated credit losses.  (¶ 145.)  When loans held by Fannie are not fully repaid or when Fannie becomes liable pursuant to guarantees it has given, Fannie suffers credit losses.  (¶ 434.)  Fannie reports the amount of such contingent losses as an "allowance" for loan losses and a "reserve" for guaranty losses.  (Id.)

**b. Analysis of Alleged Financial Reporting Misstatements**

The provisions of GAAP are subject to interpretation.  Thor Power Tool Co. v. Comm'r of Internal Revenue, 439 U.S. 522, 544 (1979).  "'Generally accepted accounting principles' . . . tolerate a range of 'reasonable' treatments, leaving the choice among alternatives to management," id., and allow reasonable accountants to reach different conclusions, SEC v. Price Waterhouse, 797 F. Supp. 1217, 1241 (S.D.N.Y. 1992).  Accounting or business judgments, even negligent ones, are not actionable.  See Oleck v. Fischer, 623 F.2d 791, 795 (2d Cir. 1980).

Generally, "[f]inancial statements filed with the [SEC] which are not prepared in accordance with generally accepted accounting principles will be presumed to be misleading or inaccurate."  17 C.F.R. § 210.4-01(a)(1).  A restatement of financial results or an allegation of a violation of GAAP or SEC regulations, however, without corresponding fraudulent intent, is not sufficient to state a securities fraud claim.  See Novak, 216 F.3d at 309; Stevelman, 174 F.3d at 84.

Despite the large scale and poor timing of the revised financial reporting at the end of the Class Period, Plaintiffs do not allege sufficient facts to establish that Fannie's financial statements were false at the time they were issued.  The Court finds no facts sufficient to identify any violations of GAAP — or any inference that Fannie was unreasonable in its judgments — let alone fraudulent intent on behalf of any of the Defendants.  Further, only the Plaintiffs contend that Fannie committed these GAAP violations — federal regulators have never claimed any violation.  In fact, OFHEO, Fannie's federal regulator prior to conservatorship, reported repeatedly that Fannie was adequately capitalized.  (See Fannie Ex. 20 at 32; Ex. 21 at 29; Ex. 22 at 30.)  Further, the FHFA has since scrutinized Fannie's financials (see, e.g., Fannie Ex. 4.) and has not asked for a restatement of any of its financials for the Class Period.

Thus, Plaintiffs allegations as to violations of GAAP and GAAS must be dismissed because the accounting rules governing the relevant practices are sufficiently flexible so as to encompass Fannie's interpretation of them during the Class Period.  Fannie operated in a heavily regulated environment, and even after entering conservatorship, no restatements of Fannie's financials have been ordered.  In addition, without a sufficiently pleaded misstatement, there can be no finding of scienter.

i.    *Fannie's Alleged Failure to Report a Valuation Allowance for DTAs*

The Complaint alleges that, despite mounting evidence of the deterioration of the subprime and Alt-A mortgage markets, Fannie failed to report any valuation allowance against its DTAs during the Class Period for fear that accurate financial reporting would disclose Fannie's failure to meet its Core Capital requirements.  (¶¶ 163–64, 166–68, 462.)  Though Fannie did not report any valuation allowance against its DTAs during the Class Period, following the Class Period — in the third quarter of 2008 — Fannie recorded a valuation allowance of $26 billion, reducing its DTAs by over 80% to $21.4 billion.  (¶¶ 168, 471.)  As a result of this valuation allowance, Fannie's Core Capital fell from $47 billion to $16.6 billion, less than half of the $33 billion in statutory minimum capital that Fannie was required to maintain.  (¶¶ 168, 471.)  Plaintiffs claim: (i) that Fannie falsely represented during the Class Period that it would be able to realize its DTAs over the appropriate term and in accordance with GAAP (¶¶ 329, 375–76), and (ii) that Fannie should have written off or reduced those assets by an appropriate valuation allowance to an amount more likely than not to be realized in the near future.  (¶¶ 157, 160.)

Statement of Financial Accounting Standards ("SFAS") No. 109 governs the maintenance of deferred taxes on a company's balance sheet.  According to Rule 109, the

booked amount of a company's deferred tax credits must be reduced by a "valuation allowance, if, based on the weight of available evidence, it is *more likely than not* (a likelihood of more than 50 percent) that some portion or all of the deferred tax assets will not be realized" in the future. (Hall Decl. Ex. 2, SFAS 109 ¶ 17(e).)  This is a very subjective standard.  Plaintiff points to negative Fannie evidence (such as: (1) cumulative losses in the last 12 quarters; (2) additional losses expected in the near future; and (3) unsettled circumstances such as the present and expected condition of the housing market that, if unfavorably resolved, would adversely affect future operations and profit levels on a continuing basis in future years).  If substantiated, this evidence would indicate that a valuation allowance was likely needed.  (¶ 463; see Hall Decl. Ex. 2, SFAS 109 ¶ 23.)

Fannie did suffer a cumulative pre-tax loss of $913 million for the years 2006 and 2007, and it was forecasted by Thompson Financial that Fannie would suffer another calendar year loss in 2008.  Fannie's 2007 10-K reported DTAs of $13 billion, up from $8 billion the year before.  Plaintiffs urge that this increase could not possibly be realized in the future and that Fannie should therefore have written down their DTAs by an appropriate valuation allowance.  Fannie did not reach the cumulative pre-tax losses for the past 12 quarters benchmark until early 2008 — after the last Deloitte audit at issue, after the time at which Plaintiff alleges Fannie should have taken the write-down, and shortly before conservatorship.

As a result, the Court will not intervene in a business and accounting judgment simply because Plaintiffs allege that the write-down in the third quarter of 2008 should have occurred earlier.  (See ¶ 168)  The fact that a financial item is accounted for differently, or in a later period, does not support an inference that a previously filed financial statement was fraudulent.  This is an allegation of fraud by hindsight, which is insufficient to withstand a motion to dismiss.

See Slayton v. Am. Express Co., 604 F.3d 758, 776 (2d Cir. 2010); Shields, 25 F.3d at 1129 (2d Cir. 1994).

Plaintiffs further argue that, based on a corporate tax rate of 35%, Fannie would have needed to earn $37 billion in near term earnings in order to utilize the full amount of DTAs, and that there were no such prospects.  (¶ 469.)  Plaintiffs point to the fact that during the four years of the housing boom from 2003 though 2006 Fannie had only reported net income totaling $23 billion, (id.), but it is taxable net income which is the relevant metric.  (Hall Decl. Ex. 2, SFAS 109 ¶ 21 (explaining that realization of DTAs depends on the existence of future taxable income, not net income).)  Further, while a declining market existed at the time Plaintiffs allege Fannie should have taken the write-down, and was likely to continue to exist into the near future, this fact must be balanced against the likelihood of future profits management expected to be realized.  Given that the normal I.R.S. limit on carry-forwards is 20 years, see 26 U.S.C. § 172(b)(1)(A)(ii), Plaintiffs fail to allege sufficient facts to warrant an inference that Fannie committed fraud in believing that it could earn sufficient income over that period — not the 3–5 year period suggested by Plaintiffs — to realize the DTAs before they expired.

ii.    *Fannie's Alleged Failure to Report Adequate OTTI*

Plaintiffs allege that the circumstances requiring classification by Fannie of fair value losses from available-for-sale securities as other-than-temporary impairments existed beginning in the third quarter of 2007, and that Defendants therefore committed fraud in not writing these losses down earlier.[18]  Specifically, Plaintiffs assert that because certain assets were written

---

[18] "Available-for-sale" securities are those held neither principally for the purpose of trading in the near term nor with the intention of holding them to maturity.  (¶ 151; accord Hall Decl. Ex. 5, SFAS 115 ¶ 12b.)  Unlike fair value losses of other securities, fair value losses of available-for-sale securities are considered "unrealized" losses, and, therefore, are not recorded on the income statement and do not affect Core Capital unless such losses have become classified as "other-than-temporary."  (¶ 152; Hall Decl. Ex. 4; Ex. 5, SFAS 115 ¶¶ 13, 16.)

down after Fannie entered conservatorship,[19] Fannie's management could not have had the required intent and ability to hold the assets to recovery.

SFAS No. 115 governs accounting for OTTI and states that guidance regarding when a loss has become "other-than-temporary" is provided in SEC Staff Accounting Bulletin No. 59 ("SAB 59").  (See Hall Decl. Ex. 5, SFAS 115 ¶ 16 n.4.)  SAB 59 states that the factors to be considered are: (a) "length of the time and the extent to which the market value has been less than cost"; (b) "near-term prospects of the issuer"; and (c) "intent and ability of the holder to retain its investment in the issuer for a period of time sufficient to allow for any anticipated recovery in market value."  17 C.F.R. § 211(5)(M); see also In re MoneyGram Int'l, Inc. Sec. Litig., 626 F. Supp. 2d 947, 957 (D. Minn. 2009) (explaining that an impairment is not considered "other-than-temporary" if there is an intent and ability to hold the asset until the time of a reasonably expected recovery in value).

Plaintiffs allege that all three factors existed starting no later than the third quarter of 2007 and point out that two-thirds of the unrealized losses from available-for-sale securities had been in a loss position for twelve consecutive months or longer, (see Hall Decl. Ex. 3, 2007 Form 10-K, at 91–92), and thus, "there was no prospect for an imminent recovery in value."  (¶ 456.)  GAAP, however, does not require that management write down assets as OTTI, if management considers it probable that all amounts due will be collected and that the security will recover its value during the period management intends to hold it.  (See Hall Decl. Ex. 5, SFAS 115 ¶ 16.)  Therefore, Plaintiffs' suggested nine month period, (Pl. Mem. 37), is arbitrary

---

[19] During the year before conservatorship, Fannie classified $1.4 billion of a total of $17 billion in unrealized losses to its available-for-sale securities as "other than temporary."  (See ¶ 155.)  Notably, Fannie reported $6.4 billion in other-than-temporary impairments in the last two quarters of 2008, an amount more than four times as large for a period half as long.  (Id.)

— management may have intended to hold the securities through the market downturn until a point at which the market recovered.

In addition, by the third quarter of 2007, Fannie was forecasting that the housing market downturn that had begun in 2006, (¶ 59), would continue through 2008 with increasing delinquencies and foreclosures.  (¶¶ 455, 468.)  Following this argument, Plaintiffs allege that Defendants could not have intended to hold the available-for-sale securities until an anticipated recovery because no such recovery was anticipated.  Plaintiffs support this point mainly with the 2007 Home Price Forecast report and the assumption that the conservator's write-down negates any argument that the prior failure to report additional OTTI was based on Defendants' anticipation of a recovery.  This argument relies on hindsight, however, and such allegations are insufficient to survive a motion to dismiss. See Panther Partners, Inc. v. Ikanos Commc'ns, Inc., 538 F. Supp. 2d 662, 672 (S.D.N.Y. 2008); Caiafa v. Sea Containers Ltd., 525 F. Supp. 2d 398, 410, 412 (S.D.N.Y. 2007), aff'd, 331 F. App'x 14 (2d Cir. 2009) (dismissing claim because defendants' $500 million write-down did not establish that previous financial statements were fraudulent).

iii.     *Fannie's Alleged Failure to Report Adequate Loan Loss Reserves*

When Fannie filed its 2006 10-K on August 16, 2007, the probability of Fannie's credit losses had substantially increased due to its heightened exposure to high risk mortgages and the sharp downturn of the housing market.  (¶ 146.)  As a result, in mid-2007, Fannie significantly reduced its investments in, and guarantees of, new Alt-A loans.  (¶ 131.)  The Complaint alleges that, under GAAP, the increased probability of Fannie's credit losses required Fannie to make corresponding increases in its loss reserves.  (¶¶ 136, 146.)  Fannie, however, did not begin to increase its loan loss reserves until the fourth quarter of 2007, when Fannie reported reserves

40% higher than the largest amount Fannie recorded in any previous quarter.  (¶¶ 147, 444.)
Similarly, in the fourth quarter of 2008, Fannie increased its combined loss reserves from $15.6
billion to $24.8 billion.  (¶ 148.)

Under SFAS No. 5, entitled "Accounting for Contingencies," some losses must be
estimated and reported as negative amounts on Fannie's income statement and balance sheet,
even before the borrower has failed to make full payment to Fannie or the guaranteed party has
demanded payment from Fannie.  (See ¶¶ 434–35.)  This circumstance occurs when two
conditions are met: (1) it has become "probable that one or more future events will occur
confirming the fact of the loss," and (2) "[t]he amount of the loss can be reasonably estimated."
(¶ 435 (quoting SFAS 5 ¶8); see also ¶ 436 ("Probable means the future event or events are
likely to occur; however, the conditions for accrual are not intended to be so rigid that they
require virtual certainty before a loss is accrued.") (quoting American Institute of Certified
Public Accountants Audit and Accounting Guide, Depository and Lending Institutions, ¶ 9.34).)

Plaintiffs again argue that because it happened later, it was fraudulent not to disclose it
earlier.  Here, Fannie should have, based upon "expectations about the future," increased its loan
loss reserves in early 2007, which would have, in turn, reduced Fannie's Core Capital.  (¶¶ 95,
442, 445; Pl. Mem. 43.)  Plaintiffs thus claim that Fannie manipulated the accounting results so
as to give the appearance that Fannie met the minimum Core Capital requirements mandated by
federal regulators without actually meeting those standards.

Plaintiffs again mainly support this argument with the internal 2007 Home Price
Forecasting Report indicating a 50% market decline over three to five years.  This report, as
alleged, would seem to indicate the existence of probable future events confirming the fact of
loss.  GAAP makes clear, however, that reserves are required only for *current* impairments or

liabilities as of the date of the financial statements at issue which meet the above-mentioned conditions.  The losses forecasted in the report were not current impairments as of the date of issuance of Fannie's financials for those years.  Further, Fannie *did* increase its provisions for credit losses throughout the Class Period. Though the losses may have been predictable to a degree, based on internal forecasts, Fannie did have loss reserves *in excess* of their reasonable loss estimate at the time and, in fact, continued to increase those reserves gradually through 2007.  (See ¶ 148.)  In the fourth quarter of 2008, Fannie made a massive increase to its combined loss reserves, (¶ 148), but that is not, in itself, an indicator that the previous reserve levels were inadequate.

### c. Outside Auditor Liability: Allegations Against Deloitte & Touche

Pleading scienter for an auditor is demanding. In re Refco, Inc. Sec. Litig., 503 F. Supp. 2d 611, 657 (S.D.N.Y. 2007) (quoting In re Marsh & McLennan Co., Inc. Sec. Litig., 501 F. Supp. 2d 452, 488 (S.D.N.Y. 2006)).  "For an accountant to be found to have acted recklessly during an audit, its alleged misconduct must 'approximate an actual intent to aid in the fraud being perpetrated by the audited company.'" Id.

> This standard requires more than "a failure to follow GAAP."  Plaintiffs must prove that "[t]he accounting practices were so deficient that the audit amounted to no audit at all, or an egregious refusal to see the obvious, or to investigate the doubtful, or that the accounting judgments which were made were such that no reasonable accountant would have made the same decisions if confronted with the same facts."

Id.

### i.   Allegations of Misstatements and Omissions in Financial Statements

Plaintiffs allege that, in conjunction with the supposed misstatements and GAAP violations in Fannie's 2006 and 2007 10-Ks, as detailed above, Deloitte's report in each of these

10-Ks stated misleadingly that Fannie's financial statements "present[ed] fairly, in all material respects, the financial position of Fannie . . . in conformity with [GAAP]."  (¶¶ 36, 233, 475–76, 496.)  In other words, Plaintiffs claim that Deloitte had advance knowledge of the impending housing collapse and, in violation of the accounting and auditing standards, intentionally did not reflect that forecast in Fannie's financial statements.

Since Plaintiff has failed to adequately plead any GAAP violations in Fannie's financial statements for the Class Period, however, Plaintiffs similarly fail to allege any misstatements or omissions by Deloitte in its audit opinions or violations of GAAS.  Further, even if a misstatement or omission had been identified in the financial statements, Plaintiffs fail to meet the more exacting pleading standard of scienter for an outside auditor.  The Court finds no factual allegations giving rise to a "strong inference" of fraudulent intent.

### ii.    *"Going Concern" Qualification*

Plaintiffs also allege that Deloitte should have included a "going concern" qualification in its audit report on Fannie's year-end 2007 financial statements.  (¶¶ 488, 520.)  Plaintiffs allege no facts, however, supporting this contention other than a "deteriorating housing and credit market" and Fannie's placement into government conservatorship nine months later. (¶ 520 (citing 2008 3rd Quarter Form 10-Q at 147–48; see Ex. G).)  Plaintiff fails to plead facts supporting a conclusion that Deloitte fraudulently violated GAAS by issuing a "clean" opinion on Fannie's 2007 year-end financial statements.

Going-concern qualifications are governed by Professional Auditing Standard 341 ("AU § 341"), which provides that an "auditor has a responsibility to evaluate whether there is substantial doubt about the entity's ability to continue as a going concern for a reasonable period of time, not to exceed one year beyond the date of the financial statements being audited."  (AU

§ 341.02.)  Inclusion of a going-concern qualification requires the auditor to use their judgment: "[t]he auditor's evaluation is based on his or her knowledge of relevant conditions and events that exist at or have occurred prior to the date of the auditor's report." (Id.)  In addition, AU § 341 does not provide bright-line rules or preclude an auditor from declining to express an opinion in uncertain cases.  See AU § 341.12 n.4 (explaining that "[n]othing in this section . . . is intended to preclude an auditor from declining to express an opinion in cases involving uncertainties"); Oleck v. Fischer, No. 73 Civ. 1460-CSH, 1979 WL 1217, at *24 (S.D.N.Y. June 8, 1979) (concluding that an auditor's decisions, including issuance of a clean opinion with respect to a company that subsequently went bankrupt, were "judgmental, and in no manner tainted by conduct which could be characterized as reckless"), aff'd, 623 F.2d 791 (2d Cir. 1980).

Courts evaluate going-concern assessments by contrasting "indicia of impending failure" with the company's ability to "obtain the refinancing it need[s] to survive."  In re Polaroid Corp. Sec. Litig., 465 F. Supp. 2d 232, 244, 247 (S.D.N.Y. 2006).  Fannie's potential ability to overcome liquidity problems by refinancing debt is, therefore, key.  See id. at 247; see also AUSA Life Ins. Co. v. Ernst & Young, 206 F.3d 202, 206 (2d Cir. 2000) (equating prospects for continuing as going concern with company's ability to "survive"); Schick v. Ernst & Young, 808 F. Supp. 1097, 1102 (S.D.N.Y. 1992) (going-concern assessment looks to company's liquidity).

The Complaint offers no facts suggesting that, as of year-end 2007, Deloitte knew that Fannie would be unable to obtain financing in 2008.  Nor does the complaint sufficiently establish that Deloitte knew or should have known that the housing market would collapse and take Fannie with it.  Even Fannie's conservatorship in September 2008 does not show that the company ceased to be a going concern.  "At least as early as the 1930s, it was recognized that the

purpose of a conservator was to maintain the institution as an ongoing concern." <u>Resolution Trust Corp. v. CedarMinn Bldg. Ltd. P'ship.</u>, 956 F.2d 1446, 1454 (8th Cir. 1992).  In fact, despite the conservatorship, Fannie remains a going concern and has so stated in each of its filings since entering the conservatorship.[20]

## IV.  <u>Loss Causation</u>

As the Court has already addressed — and dismissed — Plaintiffs' claims regarding Fannie's risk exposure and alleged accounting irregularities, the Court need only consider loss causation as to Plaintiffs' claims of misstatements regarding Fannie's internal risk management and controls.  Specifically, Plaintiffs must sufficiently allege that "it is plausible" that their loss "was the result — at least in part" of the fact that Defendants concealed that their internal risk management and controls were woefully inadequate during the Class Period.  <u>See</u> <u>In re Bristol Myers Squibb Co. Sec. Litig.</u>, 586 F. Supp. 2d 148, 166 (S.D.N.Y. 2008).  In <u>Bristol Myers</u>, this Court found it plausible that a defendant's misconduct, which resulted in a rejection of a settlement by government regulators and a subsequent stock price drop, caused a plaintiff's losses.  <u>Id.</u> at 165–66.  The instant Complaint is similar — Plaintiffs allege that Defendants' misstatements regarding internal risk management and controls, which, in turn, resulted in government conservatorship, caused a stock price drop, which consequently caused their losses. Although it may be likely that a significant portion, if not all, of Plaintiffs' losses were actually the result of the housing market downturn and not these alleged misstatements, at this stage of pleading, "[t]he Court need not make a final determination as to what losses occurred and what

---

[20] <u>See</u> Ex. G, 2008 Form 10-Q at 148 ("We are operating as a going concern and in accordance with our delegation of authority."); Ex. C, 2008 Form 10-K at F-11 ("Based on consideration of all the relevant conditions and events affecting our operations, including our dependence on the U.S. Government, we continue to operate as a going concern and in accordance with our delegation of authority."); Ex. H, 2009 1st Quarter Form 10-Q at 117 (same); Ex. I, 2009 2nd Quarter Form 10-Q at 124 (same).

actually caused them," and need only find that Plaintiffs' allegations are plausible.  Id. at 166.

As a result, the Court finds that Plaintiffs have sufficiently alleged that Defendants' purported

concealment of the inadequacy of Fannie's internal risk management and controls caused

Plaintiffs' loss, "at least in part."

## V.     **Individual Defendant Liability**

### a. Individual Defendants' Liability Under 10(b) and 10b-5

Since, as discussed above, there have been no actionable misstatements pleaded by

Plaintiffs with regard to Fannie's entry into the market, their underwriting standards, and the

geographic concentrations of their purchased mortgages, it follows that there were no actionable

misstatements made by the Individual Defendants regarding these items.  Plaintiffs further allege

that the Individual Defendants reassured investors that Fannie's Core Capital levels and financial

statements met GAAP requirements and otherwise were adequate. (¶¶ 241, 297, 308, 340, 407.)

Since Plaintiffs fail to sufficiently plead violations of GAAP by Fannie as an entity, they cannot

sufficiently plead that the Individual Defendants are liable for any violations that have not been

sufficiently pleaded in the first place.

The Court has denied Fannie's motion to dismiss concerning Plaintiffs' allegations that

Fannie misrepresented the soundness of their internal risk management capabilities.  The Court

now turns to whether the Individual Defendants may be personally liable for these potential

misstatements.

### i.     *Mudd and Dallavecchia*

Defendants Mudd and Dallavecchia, as the recipient and sender, respectively, of the

October 2006 and July 2007 emails, had personal knowledge of Fannie's allegedly inadequate

internal risk controls.  In spite of this knowledge, insofar as Dallavecchia made statements such as: "[o]ur purchases have been prudent and have been made when we concluded that they would contribute to our mission objectives," and "we participate in the subprime market in accordance with parameters that were agreed between my team and the business leaders" (¶ 184); and insofar as Mudd made statements such as, "we believe Fannie Mae is well positioned to weather the turmoil in the mortgage market. . . . I believe Fannie Mae is well situated for the future" (¶ 212); it follows that these Defendants may be personally liable under Section 10(b) and Rule 10b-5 for making material misstatements.

*ii.*     *Swad and Blakely*

Plaintiffs do not allege, however, that Defendants Swad or Blakely had knowledge of these emails. (<u>See</u> ¶ 578.)  Plaintiffs' individualized scienter allegations regarding these Defendants revert, instead, to claims that Swad and Blakely knew of Fannie's relaxed underwriting standards and that they concealed the extent of Fannie's participation in the subprime market.  As Plaintiffs' only sufficient allegations of scienter pertain to the emails exchanged between Dallavecchia and Mudd, and because it is not alleged that Swad and Blakely had knowledge of these emails, it follows that Plaintiffs have not alleged that Swad or Blakely possessed sufficient scienter. As such, the individual allegations against these Defendants must be dismissed.

**b. Section 20(a): Control Person Liability**

Section 20(a) of the Exchange Act provides that "[e]very person who, directly or indirectly, controls any person liable under any provision of this chapter . . . shall also be liable jointly and severally with and to the same extent as such controlled person" unless the purported

control person can demonstrate that he "acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action."  15 U.S.C. § 78t(a).

"[T]o plead a prima facie case of control person liability under section 20(a), a plaintiff must allege '(1) a primary violation by the controlled [entity], (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud.'"  In re Scottish Re Group Sec. Litig., 524 F. Supp. 2d 370, 386 (S.D.N.Y. 2007).  It is not sufficient for a plaintiff to allege that an individual defendant has control person status; instead, the plaintiff must assert that the defendant exercised actual control over the matters at issue.  Id.

Control person liability need not be pleaded with particularity and is generally analyzed under the "short and plain" statement analysis of Rule 8(a).  See Sedona Corp. v. Ladenburg Thalmann & Co., Inc., No. 03 Civ. 3120 (LTS) (THK), 2005 WL 1902780, at *16 (S.D.N.Y. Aug. 9, 2005) (holding that a plaintiff's pleading with respect to the elements of control person liability need only meet the requirements of  8(a) since "[n]either the PSLRA (because scienter is not an essential element), nor Rule 9(b) (because fraud is not an essential element), apply to a Section 20(a) claim").  Some courts, however, analyze the culpable participation prong under the heightened pleading standard of the PSLRA.  In re Global Crossing, Ltd. Sec. Litig., No. 02 Civ. 910 (GEL), 2005 WL 1907005, at *5 (S.D.N.Y. Aug. 8, 2005) ("[S]ince culpable participation is an element [of 20(a) claims], the PSLRA's heightened pleading requirements apply . . . .").

*i.*     *20(a) Liability Regarding Risk Exposure and GAAP*

Because the "controlled person" in this instance is Fannie, and because Fannie has not committed a primary violation of the Exchange Act concerning risk exposure or GAAP, Section 20(a) is irrelevant with regard to this branch of Plaintiffs' allegations.  Regardless of whether or

42

not Individual Defendants are in control of the violator, they cannot be culpable participants in a nonexistent fraud.

ii.     20(a) Liability Regarding Internal Risk Management and Controls

As discussed previously, Fannie may have violated 10b-5 via misstatements by Mudd and Dallavecchia regarding Fannie's internal risk controls.  As a result, Plaintiffs satisfy the "primary violation" requirement.  Further, "[a]lthough status as officer or committee member is generally not enough to constitute control, and thus a mere recitation of [the Individual Defendant]'s title[s] . . . is not sufficient," In re Alstom SA Sec. Litig., 406 F. Supp. 2d 433, 494 (S.D.N.Y. 2005), Plaintiffs allege enough facts to suggest that the Individual Defendants did indeed have control over Fannie: Mudd, as CEO, was not only Fannie's most senior officer, but he signed the 10-Ks and 10-Qs that contained many of Fannie's purported misstatements, as did Swad, Fannie's CFO (¶ 28);[21] Dallavecchia, as Executive Vice President and Chief Risk Officer, was responsible for Fannie's risk controls and for reviewing and approving the methodology and amount of Fannie's combined loss reserves, and also contributed to Fannie's misstatements (¶31); and Blakely does not challenge his Control Person status.  See In re Parmalat Sec. Litig., 594 F. Supp. 2d 444, 455–56 (S.D.N.Y. 2009) ("'[O]nly the ability to direct the actions of the controlled person, and not the active exercise thereof' is required to establish control.") (citation omitted); see also Hall v. Children's Place Retail Stores, Inc., 580 F. Supp. 2d 212, 235 (S.D.N.Y. 2008) ("Whether a person is a 'controlling person' is a fact-intensive inquiry, and generally should not be resolved on a motion to dismiss.'") (citing In re Oxford Health Plans, Inc., 187 F.R.D. 133, 143 (S.D.N.Y. 1999)).

---

[21] Swad has not challenged his status as a control person.

While a party cannot be held liable for both a primary violation and as a control person, alternative theories of liability are permissible at the pleading stage.  See In re Parmalat Sec. Litig., 375 F. Supp. 2d 278, 310 (S.D.N.Y. 2005).  "Culpable participation" is, as discussed above, sufficiently pled for Mudd and Dallavecchia so far as Plaintiffs allegations regarding internal risk management are concerned.  Insofar as scienter pleadings under Section 10(b) and Rule 10b-5 are more difficult to allege than 20(a) claims (due to PSLRA and Rule 9(b)), it follows that Plaintiffs have satisfied 20(a)'s "culpable participation" prong for these Defendants. See In re Take-Two, 551 F. Supp. 2d at 308 ("[B]ecause the Court has determined that [Plaintiff] adequately pleads [Defendant's] scienter . . . Count II sufficiently alleges [Defendant's] culpable participation in that fraud as well.") (citing In re AOL Time Warner, Inc. Sec. and "ERISA" Litig., 381 F. Supp. 2d, 219, 235 (indicating that adequate scienter allegations necessarily satisfy culpable participation element)).

However, Plaintiffs plead no facts supporting their allegation that Swad and Blakely were culpable participants in violation of 10(b) and 10b-5.  In Police and Fire Ret. Sys. of City of Detroit v. SafeNet, Inc., 645 F. Supp. 2d 210, 227 (S.D.N.Y. 2009), this court clearly held that culpable participation, in some meaningful sense, is a requirement of 20(a) liability.  See also ATSI Commc'ns, 493 F.3d at 108 (citing SEC v. First Jersey Sec., Inc., 101 F.3d 1450, 1472 (2d Cir. 1996)). As a result, Plaintiffs claims against Swad and Blakely under 20(a) must be dismissed.

## CONCLUSION

For the foregoing reasons, Defendants' motion is GRANTED IN PART and DENIED IN PART. Specifically:

(1) With respect to Plaintiffs' claim against Fannie and the Individual Defendants for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5, the Court:

> (a) GRANTS Defendants' motion to dismiss as to Plaintiffs' allegations regarding Fannie's subprime and Alt-A mortgage exposure and financial reporting as to all Defendants;

> (b) DENIES Defendants' motion to dismiss as to Plaintiffs' allegations regarding Fannie's internal controls and risk management as to Fannie, Mudd, and Dallavecchia;

> (c) GRANTS Defendants' motion to dismiss as to Plaintiffs' allegations regarding Fannie's internal controls and risk management as to Swad and Blakely; and

(2) With respect to Plaintiffs' claim against Deloitte for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5, the Court GRANTS Defendants' motion to dismiss; and

(3) With respect to Plaintiffs' claim against the Individual Defendants for control person liability under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), the Court:

> (a) GRANTS Defendants' motion to dismiss as to Plaintiffs' allegations regarding Fannie's subprime and Alt-A mortgage exposure and financial reporting as to all the Individual Defendants;

> (b) DENIES Defendants' motion to dismiss as to Plaintiffs' allegations regarding Fannie's internal controls and risk management as to Mudd and Dallavecchia;

> (c) GRANTS Defendants' motion to dismiss as to Plaintiffs' allegations regarding Fannie's internal controls and risk management as to Swad and Blakely; and

The Clerk of Court is directed to close the motions at docket numbers 155, 156, 161, 163, and 167.

Dated: New York, New York
September 30, 2010

SO ORDERED

PAUL A. CROTTY
United States District Judge