**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
(Transferred from the United States District Court for the District of Massachusetts)

|  |  |
|---|---|
| LIBERTY MUTUAL INSURANCE COMPANY, LIBERTY MUTUAL FIRE INSURANCE COMPANY, PEERLESS INSURANCE COMPANY, SAFECO CORPORATION and LIBERTY LIFE ASSURANCE COMPANY OF BOSTON | Case No. 09-md-02013-PAC  Case No. 10-cv-09184-PAC  ECF Case |
| Plaintiffs, v. GOLDMAN, SACHS & CO., Defendant. | **SECOND AMENDED COMPLAINT AND JURY DEMAND** |

## I.   PRELIMINARY STATEMENT

1.     The Plaintiffs Liberty Mutual Insurance Company, Liberty Mutual Fire Insurance Company, Peerless Insurance Company, Safeco Corporation and Liberty Life Assurance Company of Boston bring this securities fraud action against Defendant Goldman, Sachs, & Co. ("Goldman") for making materially misleading statements and omissions in connection with the Series P and Series S preferred stock offerings of the Federal National Mortgage Association ("Fannie Mae") in September and December 2007.  The Plaintiffs invested $62.5 million in those two preferred stock offerings in reliance upon misrepresentations and omissions by Goldman, underwriter of the offerings, about Fannie Mae's financial condition.

2.     The Series S Offering Circular and the Series P Private Placement Memorandum written by Goldman claimed that Fannie Mae exceeded its minimum capital requirements, and that the purpose of the Series P and Series S preferred stock offerings was to bolster Fannie Mae's capital base.  As Plaintiffs have learned, the stated purpose for the offering was false.  Goldman knew or recklessly ignored that Fannie Mae did not meet its minimum capital

requirements, and that Fannie Mae would be severely undercapitalized even after the sale of the preferred stock because its portfolio of mortgage securities was grossly overvalued.  If Plaintiffs had been informed of the true state of Fannie Mae's capitalization, they would never have purchased the Series P and Series S preferred shares.  As a result of Plaintiffs' reliance on Goldman's material misrepresentations and omissions, Plaintiffs' investments are virtually worthless.

3.      For a number of years preceding its underwriting of Fannie Mae preferred stock in 2007, Goldman had a deep and wide involvement in the subprime and Alt-A residential mortgage financing industry in the United States.  Goldman was actively involved in helping mortgage lenders securitize pools of high risk, poor quality residential mortgage loans and acted as an underwriter in selling these securities to investors.  By the end of 2006, Goldman's securitization of subprime and Alt-A mortgage loans had increased to more than $35 billion.  As part of the underwriting process, Goldman conducted due diligence and became familiar with the lax policies and standards of subprime and Alt-A loan originators, like Countrywide.  By January of 2007, Goldman also had extended $1.5 billion dollars in "warehouse" lines of credit to these originators to fund the mortgages they were granting.  Goldman was repaid only when the originator's loans were securitized and sold to investors.  As a result, Goldman had a strong incentive to maintain a market for subprime and Alt-A loan products, regardless of their quality.

4.      Beginning in late 2006 and in the first three quarters of 2007, Goldman, using its unique knowledge and sophistication about the deteriorating condition of the real estate financial market, radically altered its internal investment strategy.  Goldman was not only aware that significant problems were developing in the subprime and Alt-A mortgage sectors, but realized that increasing mortgage delinquencies had already led to a dramatic increase in the number of

2

defaults and foreclosures. Goldman knew by the third quarter of 2007 that securities backed by subprime and Alt-A mortgages had already lost substantial value.

5.      In 2007, Goldman took a huge net short position on securities backed by subprime and Alt-A residential mortgages that generated $3.7 billion in profits for the firm. Before institutional investors became fully aware of the risk, Goldman also took actions to transfer the losses on its own subprime and Alt-A mortgage inventory to them. These and other numerous fraudulent and deceptive practices of Goldman are documented in the comprehensive Majority and Minority Staff Report of the Permanent Subcommittee on Investigations of the United States Senate released on April 13, 2011 ("Staff Report").

6.      An internal presentation to Goldman's Board of Directors on September 17, 2007 describes the "Tactical Positioning" of Goldman's business in reaction to "the ensuing mortgage credit and liquidity crisis." Goldman by then knew that subprime losses had, on average, already increased to the "low teens," and Goldman had taken significant mark to market losses on its own subprime and Alt-A mortgage-related assets. Goldman was also shutting down all warehouse lines of credit which it had previously extended to subprime and Alt-A loan originators, and was demanding repayment of these lines of credit. Recognizing an opportunity to generate large profits for itself, Goldman also systematically began betting against residential subprime and Alt-A securities by taking short positions through several vehicles, including credit default swaps.

7.      After Goldman had repositioned its business to profit from a collapse of the subprime and Alt-A market, it served as a lead underwriter (Senior Co-Manager and Placement Agent) for the Series P and Series S offerings of Fannie Mae preferred stock. The stated purpose of these offerings was to allow Fannie Mae to raise surplus capital to strengthen its balance sheet

well beyond its required capital amounts.   However, as Goldman knew, Fannie Mae was severely under capitalized and could not meet its capital requirements even with the proceeds of the Series P and Series S stock offerings.   Specifically, Goldman knew or recklessly disregarded that: 1) the value of Fannie Mae's portfolio of hundreds of billions of dollars of subprime and Alt-A securities and mortgage loans was significantly overstated; and 2) Fannie Mae's write-downs and loss reserves, which were only a fraction of one percent, were unrealistically low.

8.      Goldman's actions in underwriting the Fannie Mae Series P and Series S offerings were fraudulent and part of a scheme in 2007 to defraud investors, as more fully described in the Staff Report.   Goldman not only profited from the collapse of the mortgage market, but also magnified risks in the market by selling high risk, poor quality mortgage products to investors around the world.   Goldman concealed its adverse financial interests and other critical information from investors, sold investors poor quality investments and placed its financial interests before its clients.

## II.      JURISDICTION AND VENUE

9.      This court has jurisdiction over this matter pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. §§ 1331 and 1367.

10.     Venue is proper in the District of Massachusetts pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, because Goldman is found, is an inhabitant, or transacts business in that District.

11.     In connection with the acts alleged in this Second Amended Complaint, Goldman, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to the U.S. mails, interstate telephone communications and the facilities of the New York Stock Exchange.

## III.   PARTIES

12.     Plaintiff Liberty Mutual Insurance Company is a Massachusetts corporation with its principal place of business in Boston, Massachusetts.  Liberty Mutual Insurance Company is a wholly owned subsidiary of Liberty Mutual Group, Inc., which has its headquarters in Boston, Massachusetts.

13.     Plaintiff Liberty Mutual Fire Insurance Company is a Wisconsin corporation with its principal place of business in Boston, Massachusetts.  Liberty Mutual Fire Insurance Company is a wholly owned subsidiary of Liberty Mutual Group, Inc., which has its headquarters in Boston, Massachusetts.

14.     Plaintiff Peerless Insurance Company is a New Hampshire corporation with its principal place of business in Boston, Massachusetts.  Peerless Insurance Company is a wholly owned subsidiary of LIH US P&C Corporation, which has its headquarters in Boston, Massachusetts.

15.     Plaintiff Safeco Corporation is a Washington corporation with its principal place of business in Boston, Massachusetts.  Safeco Corporation is a wholly owned subsidiary of LIH US P&C Corporation, which has its headquarters in Boston, Massachusetts.

16.     Plaintiff Liberty Life Assurance Company of Boston is a Massachusetts corporation with its principal place of business in Boston, Massachusetts and is owned by Liberty Mutual Fire Insurance Company and Liberty Mutual Insurance Company.

17.     Defendant Goldman, Sachs & Co. is a New York limited partnership with its principal place of business in New York, New York.

## IV.     FACTUAL ALLEGATIONS

### A.     Fannie Mae's Role in the U.S. Mortgage Market

18.     Fannie Mae is a federally chartered and stockholder-owned corporation organized and existing under the Federal National Mortgage Association Charter Act. It was established in 1938 to provide stability and liquidity to the mortgage market, and legislation enacted in 1968 transformed it into a stockholder-owned and privately managed corporation. Fannie Mae issues common and preferred stock, as well as debt, and the United States does not guarantee, directly or indirectly, the debt or the obligations associated with Fannie Mae's common and preferred stock, including dividend payments.

19.     Fannie Mae does not make mortgage loans to borrowers or conduct any other operations in the market where loans are originated, which is known as the primary mortgage market. Instead, Fannie Mae operates in what is known as the secondary mortgage market. It buys mortgage loans for investment and for securitizing them into Fannie Mae residential mortgage-backed securities ("RMBS"), which then can be bought and sold in the secondary mortgage market. Fannie Mae generates revenue in primarily two ways: (1) it guarantees loans made by others (for which it is paid a fee), and (2) it maintains an investment portfolio of mortgage loans and mortgage-backed securities, including its own Fannie Mae mortgage-backed securities and private-label mortgage-backed securities, some of which are backed by subprime and Alt-A mortgages. By late 2007, Fannie Mae owned or guaranteed billions of dollars of RMBS backed by subprime and Alt-A mortgages.

### B.     Fannie Mae's Capital Requirements

20.     Since 1992, Fannie Mae has been required to maintain sufficient capital as set forth in the Federal Housing Enterprises Financial Safety and Soundness Act of 1992 (the 1992 Act). The 1992 Act defines two measures of capital: (1) Core Capital, which is the sum of

6

outstanding common stock, perpetual noncumulative preferred stock, paid-in capital, and retained earnings (similar to tier 1 capital for banks and thrifts) and (2) Total Capital, which is Core Capital plus general allowances for loan losses. The 1992 Act requires Fannie Mae to maintain Core Capital that equals or exceeds 2.5% of assets plus 0.45% of adjusted off-balance-sheet obligations, including RMBS.

21.     In 2004, OFHEO undertook a special examination of Fannie Mae and issued a report in September that year, stating that it had discovered pervasive misapplications of Generally Accepted Accounting Principles ("GAAP"). OFHEO found that upper management encouraged the misapplication of GAAP to "smooth" earnings and eliminate the volatility that GAAP requires a company to recognize and report.

22.     As a result of this investigation, OFHEO imposed a capital restoration plan that required Fannie Mae to achieve a 30% capital surplus over the statutory minimum capital requirement by September 30, 2005, and to maintain that additional capital until OFHEO modified the requirement. OFHEO imposed the 30% capital surplus requirement on Fannie Mae throughout 2007, during the Series P and Series S preferred stock offerings.

23.     OFHEO issued its final report on its investigation in May 2006. In a consent order dated May 23, 2006, Fannie Mae agreed, among other things, that its CEO and CFO would be terminated, that Fannie Mae would not increase its investment portfolio, and that Fannie Mae would improve its risk management systems, develop adequate internal accounting controls, and restate its prior period financial statements. Fannie Mae also was required to increase its capital by issuing shares of common and preferred stock.

24.     OFHEO periodically reviewed Fannie Mae's calculations to determine whether Fannie Mae met its minimum and risk-based capital requirements as reported by its management,

and set forth in the financial reports filed by Fannie Mae in 2007, including the SEC form 10-K 2006 Annual Report and the Form 10-Q Reports. The review consisted of a mathematical assessment of Fannie Mae's minimum and risk-based capital requirements set forth in 12 CFR 1750 as calculated by management and the use of a risk-based model to assess management's determinations. OFHEO did not audit, investigate or otherwise attempt to verify the information supplied to it by Fannie Mae. In making its report to Congress in 2008, OFHEO did not represent that it had done anything other than perform a review of the calculation.

## C.   Fannie Mae's Investment Portfolio

25.    Prior to 2007, there was a substantial increase in the number of subprime residential mortgage loans made to borrowers with weaker credit histories, as well as Alt-A loans made with reduced documentation requirements. Fannie Mae had significant exposure to the residential subprime and Alt-A market, both by guaranteeing these loans and by investing in subprime and Alt-A RMBS. Countrywide, a large subprime and Alt-A originator, accounted for approximately 26% of Fannie's single-family business volume in 2005 and 2006, and was Fannie Mae's largest lender customer as of September 30, 2007. In addition, Fannie Mae was an active purchaser of private-label subprime RMBS issued by Wall Street banks, including Goldman. By the time of the Series P and S preferred stock offerings Fannie Mae owned or guaranteed billions of dollars of subprime and Alt-A mortgage loans and RMBS.

26.    In late 2006, home prices started to decline, and subprime mortgage loans began to default at an increasing rate. The defaults and impairments in the subprime mortgage market spread into the Alt-A mortgage market during 2007. The value of Fannie Mae's Alt-A and subprime assets was significantly and materially compromised by this market downturn.

8

**D.     The Series P and Series S Offerings**

27.     On September 28, 2007, Fannie Mae issued 40,000,000 shares of preferred stock (the Series P), raising nearly $1 billion.  Plaintiffs acquired $30,000,000 of Series P preferred stock in the initial offering.

28.     On December 11, 2007, Fannie Mae issued 280,000,000 shares of preferred stock (the Series S), raising nearly $7 billion.  Plaintiffs acquired $32,500,000 of Series S preferred stock in the initial offering.

**E.     Fannie Mae Goes Into Conservatorship and Takes Astronomical Write-Downs**

29.     On July 30, 2008, the Housing and Economic Recovery Act of 2008 was signed into law and created a new regulator for Fannie Mae, the Federal Housing Finance Agency ("FHFA"), with new powers—the power to establish capital standards, to enforce its orders, and to put a regulated entity into receivership.

30.     On September 6, 2008, the FHFA concluded that Fannie Mae did not have adequate capital.  Fannie Mae was put into conservatorship, its management and board members were replaced by the FHFA and its designees, and all dividend payments to preferred shareholders were terminated.

31.     In the December 31, 2008 Form 10-K issued by Fannie Mae and its new management, the total write-downs and loss reserves recorded for subprime and Alt-A RMBS and mortgage loans in 2008 were $31.505 billion.  As a result, Fannie Mae no longer met its capital requirements.

32.     The huge write-downs and increases in loss reserves made in 2008 were not the product of changes in the value of the subprime and Alt-A assets that occurred in just the year 2008.  The value of Fannie Mae's subprime and Alt-A assets had, in fact, substantially declined before the Series P and Series S preferred stock were issued in 2007.

9

33.     After Fannie Mae was placed in a conservatorship in September 2008, no reasonable investor would continue to rely on the previously issued financial statements. For this reason, it was not necessary for FHFA, as conservator, to restate those earlier financial statements.

**F.     Goldman's Fraudulent Sale of Mortgage-Backed Securities to Fannie Mae.**

34.     The FHFA filed suit against Goldman (and other related entities) on September 2, 2011 for the fraudulent sale of billions of dollars in mortgage-backed securities ("Certificates"). Goldman acted as lead underwriter in 18 separate securitizations between September 29, 2005 and May 24, 2007 and sold the Certificates to Fannie Mae.

35.     As alleged by the FHFA, the registration statements for the Certificates contained statements about the characteristics and credit quality of the underlying mortgage loans that were materially false, as significant percentages of the underlying loans were not originated in accordance with the represented underwriting standards and had materially poorer credit quality than was represented in the registration statements.

36.     Goldman benefitted from a direct window into the lax origination practices of mortgage originators, like Countrywide. Goldman conducted due diligence on the originators it was purchasing loans from and carefully inspected their underwriting standards. Goldman used a third-party, Clayton Holdings, Inc., supposedly to conduct due diligence and review loans. However, Goldman "waived in" to its pools 29 percent of the loans Clayton recommended for exclusion.

37.     Beginning in 2006, Goldman began to reduce its own subprime exposure by forcing its originators to buy mortgages back from Goldman. Between 2006 and 2007, Goldman made approximately $475 million in repurchase or "put back" claims to originators and others for loans in its inventory. In March 2007, Goldman tried to put back 26% of the pool of loans it

10

held from subprime lender, New Century, which also originated loans Goldman had securitized
and sold to Fannie Mae.

38.     According to the FHFA complaint, Goldman misrepresented to Fannie Mae that
the underlying mortgage loans complied with the underwriting guidelines of the original loan
sellers, when Goldman knew that the originators did not adhere to their standard underwriting
guidelines.  Goldman also misrepresented to Fannie Mae that an overwhelming majority of the
mortgage loans were owner occupied, even though Goldman knew these figures were materially
overstated.  Goldman also misrepresented to Fannie Mae that many or most of the mortgages had
a favorable loan-to-value ratio of 80 percent or less, when Goldman knew that many of the
mortgages had a higher and more risky loan-to-value ratio.

39.     Goldman also misrepresented to Fannie Mae that the credit rating for each of the
Certificates was investment grade.  In fact, Goldman knew these credit ratings were inflated or
false as a result of Goldman's provision of incorrect data concerning the attributes of the
underlying mortgage collateral to the ratings agencies, including the borrower's loan-to-value
ratio, debt-to-income ratio, owner-occupancy status, and other loan level information.  After the
Certificates were issued, the rating agencies dramatically downgraded their ratings when the true
underwriting practices and the true value and credit quality of the mortgage loans became
known.  A significant percentage of the mortgage loans backing the Certificates have defaulted,
have been foreclosed upon, or are delinquent, resulting in massive losses to Fannie Mae.

## G.     United States Senate's Permanent Subcommittee on Investigations Concludes Goldman Engaged in Widespread Fraud

40.     On the heels of Fannie Mae's conservatorship, in November 2008 the United
States Senate's Permanent Subcommittee on Investigations began investigating the causes and
effects of the financial crisis.  The Subcommittee took hundreds of depositions and interviews,

11

reviewed millions of pages of documents, consulted with dozens of experts, and held a series of hearings, including a hearing on investment banks.

41.    On April 27, 2010, the Subcommittee held a hearing to examine the role of Goldman in the financial crisis.  Goldman was featured front and center in the investigation when the Subcommittee selected it as a case study.  Many of Goldman's senior personnel, including its Chairman and CEO, Lloyd Blankfein, and Executive V.P. and CFO, David Viniar, were called to testify.

42.    In connection with the hearing, the Subcommittee released a Joint Memorandum which made a number of findings of fact concerning Goldman, including the following:

> a)    Goldman securitized high risk mortgages.  In exchange for large fees, Goldman during the period 2004-2007 "helped lenders… securitize high risk, poor quality loans, obtain favorable credit ratings for the resulting residential mortgage backed securities (RMBS), and sell the RMBS securities to investors, pushing billions of dollars of risky mortgages into the financial system."
>
> b)    Goldman magnified the risk posed by the bad mortgages "by re-securitizing RMBS securities in collateralized debt obligations (CDOs), referencing them in synthetic CDOs, selling the CDO securities to investors, and using credit default swaps and index trading to profit from the failure of the same RMBS and CDO securities it sold."
>
> c)    Goldman shorted the mortgage market.  "As high risk mortgage delinquencies increased, and RMBS and CDO securities began to lose value, Goldman took a net short position on the mortgage market,

12

> remaining net short throughout 2007, and cashed in very large short positions, generating billions of dollars in gain."

d) Goldman created a conflict between its proprietary interests and the interests of its clients. "In 2007, Goldman went beyond its role as market maker for clients seeking to buy or sell mortgage related securities, traded billions of dollars in mortgage related assets for the benefit of the firm without disclosing its proprietary positions to clients, and instructed its sales force to sell mortgage related assets, including high risk RMBS and CDO securities that Goldman wanted to get off its books…".

Subcommittee Joint Memorandum, at 12.

43. The Subcommittee's two-year investigation culminated in the release of the Staff Report on April 11, 2011. The 650 page Staff Report focuses heavily on the conduct of Goldman, and reaffirms the above findings of fact. In addition, the Staff Report identifies a number of practices that evidence a consistent pattern of deception used by Goldman in 2007 to market securities backed by residential mortgages to investors, including (1) shorting its own securities, (2) failing to disclose key information to investors, (3) misrepresenting sources of assets, (4) selling securities designed to fail, (5) misrepresenting assets, and (6) concealing its net short position. *See* Staff Report at 602-03.

44. As shown below, the same pattern of deception was followed by Goldman when it underwrote the Fannie Mae Series P and Series S preferred stock in 2007.

## V. GOLDMAN MADE MATERIAL MISREPRESENTATIONS AND FAILED TO DISCLOSE MATERIAL FACTS

45. Goldman was a lead underwriter of the Series P and Series S preferred stock offerings. As a lead underwriter, Goldman made the statements in the Series P Private

13

Placement Memorandum and the Series S Offering Circular (collectively, "Offering Documents").

46.     Goldman assures investors, like Plaintiffs, through its website and other means, that as an underwriter it will act as a "gatekeeper" and "prepare the disclosure" in the offering document. Goldman also assures investors that its "Basic Responsibilities" as an underwriter are to "[c]onduct appropriate and thorough due diligence" on the issuer and "[e]ndeavor to ensure that there is no material misstatement/omission in the disclosure" in the offering document. In its role as a gatekeeper underwriter responsible for conducting thorough due diligence and preparing disclosures that were not misleading, Goldman had ultimate control and authority over the content of the Series P and Series S Offering Documents.

47.     Goldman's name as a lead underwriter prominently appears on the cover pages of the Offering Documents.  Plaintiffs and other investors expected Goldman to perform a reasonable due diligence investigation to ensure that the Offering Documents did not include any false or misleading statements of material information, or omit any material information. The disclosures about Fannie Mae's financial capital condition, including its surplus capital statements, would be considered by investors to be Goldman's statements and disclosures after conducting a thorough due diligence investigation on Fannie Mae.

48.     There are  many reasons why Goldman should have been on high alert when conducting its due diligence investigations in connection with the Series P and S offerings. Goldman was aware of weak internal controls at Fannie Mae.  Goldman knew that OFHEO previously found that Fannie Mae had made misstatements of its financial condition, which led OFHEO to impose a 30% capital surplus requirement on Fannie Mae.  Goldman had securitized billions of dollars in subprime and Alt-A mortgage products, and knew that the AAA credit

ratings assigned to these types of mortgage products were inflated and should be downgraded. Goldman had performed due diligence on many of Fannie Mae's subprime loan originators, including Countrywide, and knew that these loan originators had poor lending practices. Goldman was also demanding that subprime loan originators buy back millions of dollars in mortgage loans they had sold to Goldman. According to the internal presentation to Goldman's Board of Directors on September 17, 2007, Goldman was allowing its warehouse lines of credit to subprime originators to expire. The funded amount had been drastically reduced from $1.5 billion as of January 31, 2007 to $60 million as of September 2007. At that time, Goldman knew that losses on its own subprime assets already exceeded 10%, and it had taken significant mark to market losses on those subprime assets. During the first three quarters of 2007, Goldman was not only liquidating its own subprime and Alt-A assets, but also making billions of dollars by shorting these types of assets. Goldman knew that the losses realized on the billions of dollars in subprime and Alt-A assets owned or guaranteed by Fannie Mae, including the assets purchased from Goldman, would cause Fannie Mae to not meet its capital surplus requirements at the time of the Series P and S preferred stock offerings.

49. Although Goldman knew the value of Fannie Mae's subprime and Alt-A assets had severely diminished, Goldman failed to address the substantial loss in value of these assets in the Offering Documents. As a lead underwriter who had undertaken responsibility for providing an accurate disclosure and had actual knowledge of the deterioration of Fannie Mae's subprime and Alt-A assets, Goldman had a duty to inform Plaintiffs and other investors that Fannie Mae did not meet its capital requirements at the time of the Series P and S offerings.

50. Goldman conducted the marketing of the Series P and Series S preferred stock. Goldman would have solicited potential investors who might be interested in buying the

securities and would have provided the Offering Documents to investors. Investors would be expected to request any information about the offerings from Goldman, and not from Fannie Mae. In its role as a lead underwriter, Goldman exercised ultimate control and authority over the dissemination of the Series P and Series S offering documents.

51.    In connection with the Series P offering, Goldman represented to the Plaintiffs and other investors in the Private Placement Memorandum that as of June 30, 2007, Fannie Mae's core capital exceeded the statutory minimum requirement by \$12.055 billion and exceeded the OFHEO-directed 30% minimum capital requirement by \$2.959 billion. (Series P Private Placement Memorandum, at 16.)

52.    In connection with the Series S offering, Goldman represented to the Plaintiffs and other investors in the Offering Circular that as of September 30, 2007, Fannie Mae's core capital exceeded the statutory minimum by \$11.410 billion and exceeded the OFHEO-directed 30% minimum capital requirement by \$2.319 billion. (Series S Offering Circular, at 28.)

53.    Furthermore, in connection with both the Series P and Series S preferred stock offerings, Goldman represented to the Plaintiffs and other investors that Fannie Mae was raising additional capital to provide it with a cushion or "surplus" to ensure compliance, even in difficult economic conditions, not only with the minimum statutory capital requirement, but also with the OFHEO-mandated 30% minimum capital requirement. The Offering Documents state:

> While we are able to reasonably estimate the size of our book of business and therefore our minimum capital requirement, the amount of our reported core capital holdings at each period end is less certain. Changes in the fair value of our derivatives may result in significant fluctuations in our capital holdings from period to period. Accordingly, we target a surplus above the statutory minimum capital requirement and OFHEO-directed minimum capital requirement to accommodate a wide range of possible valuation changes that might adversely impact our core capital base. (Series P Private Placement Memorandum, at 16; Series S Offering Circular, at 27.)

16

54.     The foregoing statements were material because Goldman was representing that Fannie Mae met both the statutory and OFHEO-directed minimum capital requirements even though Goldman knew that Fannie Mae had purchased and guaranteed billions of dollars of subprime and Alt-A RMBS and mortgages.  Further, Goldman knew that a relatively small impairment of these mortgages and mortgage-backed securities could wipe out the capital of Fannie Mae.     Moreover, Goldman knew that investors like Plaintiffs would rely on the representations made with respect to Fannie Mae's capital requirements, because Fannie Mae could not make dividend payments if it fell below its capital requirements.

## VI.     GOLDMAN'S MATERIAL STATEMENTS AND OMISSIONS WERE FALSE

55. ˙   Goldman engaged in acts, practices and a course of business as a lead underwriter of the Series P and S offerings which operated as a fraud on Plaintiffs, in their purchase of the Series P and S preferred stock.  Goldman kept silent regarding Fannie Mae's undercapitalization, acting as though the enormous portfolio of subprime and Alt-A mortgage-related assets and guarantee contracts was properly valued.  Goldman's acts and omissions in underwriting the Series P and S offerings were part of and furthered its scheme to defraud investors in subprime and Alt-A securitizations throughout 2007.

56.     The Offering Documents are false and misleading because they claim that Fannie Mae's core capital exceeded the statutory minimum requirement and exceeded the OFHEO-directed 30% minimum capital requirement when, in fact, it did not.  Further, the Offering Documents lead investors to believe that Fannie Mae was maintaining a "surplus" above the statutory and OFHEO-directed 30% minimum capital requirements.   In fact, because the valuation placed on billions of dollars of subprime and Alt-A RMBS and mortgages held or guaranteed by Fannie Mae was significantly overstated, Fannie Mae had no surplus, but was in a serious capital deficit position at the time of each offering. The losses from Fannie Mae's

17

exposure to the Alt-A and subprime markets were significantly and materially understated in the Offering Documents.

57.    The Private Placement Memorandum for the Series P preferred stock incorporated Fannie Mae's December 31, 2006 Form 10-K, which was filed late on August 16, 2007.  In the Form 10-K, Fannie Mae reported that it held $70.125 billion in subprime and Alt-A RMBS, but recorded no write-downs.  Fannie Mae also reported that it held $261.802 billion in subprime and Alt-A mortgage loans, but recorded loss reserves for these loans of only $859 million or 0.33 percent.

58.    By June 30, 2007, Fannie Mae reported that it held $76.5 billion in subprime and Alt-A RMBS, but still recorded no write-downs.  Fannie Mae also reported that it held $300.755 billion in subprime and Alt-A mortgage loans, and had increased loss reserves for these loans to only $1.158 billion or 0.38 percent. Goldman would have been aware as a lead underwriter that Fannie Mae assigned these inflated values to its subprime and Alt-A RMBS and mortgage loans, and that Fannie Mae had recorded write-downs and loss reserves that were less than 1% of the value of these assets.

59.    Goldman knew that the representations in the Series P Private Placement Memorandum that Fannie Mae exceeded its statutory and OFHEO minimum capital requirements were false.  Goldman knew or recklessly disregarded the fact that the write-downs and loss reserves reported by Fannie Mae as of December 31, 2006, as well as those reported as of June 30, 2007, were grossly inadequate.  Goldman  failed to disclose to investors that if adequate write-downs and loss reserves had been reported at the time of the Series P offering, Fannie Mae could not meet its minimum capital requirements.

60.     The Offering Circular for the Series S preferred stock incorporated Fannie Mae's September 30, 2007 Form 10-Q report, which was filed on November 9, 2007. In the Form 10-Q, Fannie Mae reported that it held $76.2 billion in subprime and Alt-A RMBS, but recorded write-downs of only $81 million or 0.1 percent. Fannie Mae also reported that it held $314.113 billion in subprime and Alt-A mortgage loans, but recorded loss reserves for these loans of only $1.407 billon or 0.45 percent.

61.     Goldman knew that the representations in the Series S Offering Circular that Fannie Mae exceeded its statutory and OFHEO minimum capital requirements were false. Goldman knew or recklessly disregarded the fact that the write-downs and loss reserves reported by Fannie Mae as of September 30, 2007 were grossly inadequate. Goldman failed to disclose to investors that if adequate write-downs and loss reserves had been reported at the time of the Series S offering, Fannie Mae could not meet its minimum capital requirements.

62.     On December 14, 2011, the Securities and Exchange Commission ("SEC") filed a complaint against certain former officers of Fannie Mae. The SEC complaint alleges that Fannie Mae's exposure to subprime and Alt-A mortgage products was significantly understated throughout 2007. In an accompanying non-prosecution agreement, Fannie Mae has agreed not to contest a statement of facts concluding that it did not disclose to investors in the Series P and S preferred stock offerings billions of dollars of subprime and Alt-A mortgage assets that it held or guaranteed.

63.     According to the statement of facts, Fannie Mae in its Form 10-K filing for December 31, 2006, as well as its Form 10-Q filings for the first three quarters of 2007, did not include in its quantitative disclosure of subprime loans billions of dollars in Expanded Approval/Timely Payment Rewards ("EA") loans targeted to borrowers with weaker credit

19

histories. Fannie Mae's disclosure did not include billions of dollars in loans purchased or securitized from Countrywide's retail subprime lending division. In addition, in disclosing its Alt-A loan exposure, Fannie Mae excluded billions of dollars in reduced documentation loans acquired from loan originators like Countrywide.

64.    As a lead underwriter who had engaged in due diligence, and examined the books and records of both Fannie Mae and many of its subprime and Alt-A loan originators, including Countrywide, Goldman knew, or recklessly disregarded the fact that Fannie Mae had billions in additional exposure to subprime and Alt-A mortgages that was not disclosed in the financial statements and for which substantial additional write-downs and loan loss reserves should have been recorded.

65.    On December 31, 2008, Fannie Mae finally recorded more significant write-downs which reduced the value of its subprime and Alt-A RMBS by $6.752 billion or 12.88 percent, and recorded loss reserves for its subprime and Alt-A mortgage loans of $24.753 billion or 7.87 percent. Goldman knew or recklessly disregarded the fact that write-downs and loss reserves of this magnitude should have been recorded and disclosed to Plaintiffs prior to the Series P and Series S stock offerings.

## VII.    GOLDMAN ACTED WITH SCIENTER

66.    Goldman was in a unique position to determine the realistic value of subprime and Alt-A RMBS in 2007. As an underwriter of subprime and Alt-A RMBS, Goldman assured investors that it "had a process to examine the management, relevant policies and procedures, underwriting standards, creditworthiness and other aspects of each mortgage originator before [Goldman] began purchasing loans for securitization." Goldman also had an internal system of assigning "marks" or valuations to these types of securities. Goldman had sophisticated and

20

proprietary models that gave Goldman unique knowledge that RMBS securities were not safe and had declined up to 70 percent from their face value.

67.     Goldman knew that the value of its own inventory of subprime RMBS had significantly decreased in 2007, and by September 2007 Goldman assumed that losses on subprime assets had increased from approximately four percent to the low teens.  As a result, Goldman either sold or wrote-down the bulk of its subprime RMBS inventory.  Goldman, on numerous occasions in 2007, intentionally sold subprime securities to institutional customers, including Fannie Mae, at prices substantially higher than its internal valuations.  The Staff Report concluded that Goldman would "conceal its adverse financial interests from potential investors, sell investors poor quality investments, and place its financial interests before those of its clients."  Staff Report at 376.

68.     As a lead underwriter, Goldman had extensive knowledge, including access to non-public information, about Fannie Mae's capital inadequacy.  Based on its own assessment of the residential mortgage loan market, Goldman knew or recklessly disregarded the fact that the hundreds of billions of dollars of subprime and Alt-A RMBS and mortgage loans held by Fannie Mae were significantly overvalued by the time of the Series P and Series S offerings, including those assigned higher ratings.  Goldman also knew or recklessly disregarded the fact that the extremely low write-downs of assets and increases in loss reserves recorded by Fannie Mae were woefully inadequate and that Fannie Mae should have disclosed significantly higher write-downs and loss reserves at the time of the Series P and Series S preferred stock offerings.

69.     Goldman knew the importance of calculating fair value of positions and should have informed investors the valuations of Fannie Mae's subprime and Alt-A assets were far too high.  A September 17, 2007 email exchange with Daniel Sparks and David Viniar evinces

Goldman's knowledge: "There has been much speculation and commentary that it is impossible to mark many mortgage positions to market. We do not agree with that. Not only is it possible, it is absolutely essential for market participants to understand the value of what they hold so that they can manage the associated risks."

70.     Goldman made and disseminated the false and misleading statements regarding Fannie Mae's surplus capital set forth in the Offering Documents, and knew or recklessly disregarded the fact that these statements were materially false and misleading when made. Goldman knew, or recklessly disregarded, that the deteriorating subprime and Alt-A market had drastically reduced the value of Fannie Mae's mortgage-related assets and that Fannie Mae was undercapitalized.

71.     Goldman's scienter is also evidenced by the following: (1) Goldman fraudulently sold mortgage-backed securities to Fannie Mae; (2) Goldman was systematically shorting the subprime and Alt-A residential mortgage market; (3) Goldman was shorting the very subprime loan originators that were Fannie Mae's lender clients; (4) Goldman had specific knowledge of the state of the subprime mortgage industry through its purchase of a controlling stake in a subprime lender; (5) Goldman knew about the poor underwriting standards and conditions of Countrywide, Fannie Mae's largest client lender in 2006 and during the first nine months of 2007; (6) Goldman had either sold or written down its own inventory of subprime RMBS; and (7) as underwriter, Goldman had access to and would have reviewed the books and records of Fannie Mae.

72.     Beginning in December 2006 and throughout 2007, Goldman entered into and profited from a large net short position in the subprime and Alt-A residential mortgage markets. During its fiscal year ending November 30, 2007, Goldman generated approximately $3.7 billion

in profit by systematically shorting the value of mortgage-related securities. Overall, Goldman generated record net earnings of approximately $11 billion in the fiscal year ended November 30, 2007.

73.     According to the Staff Report, Goldman's net short positions reached a peak of $13.9 billion on June 22, 2007, and included a massive short position of $9 billion in RMBS that were rated AAA. Goldman then locked in profits on the shorted RMBS, and realized $2.8 billion in profits in the third quarter of 2007 –while it was underwriting the Series P and S preferred stock offerings. Goldman thus knew or recklessly ignored the fact that the extremely low (less than 1%) write-offs and loss reserves reported by Fannie Mae at the time of the offerings were grossly inadequate. In fact, at the same time that Goldman was underwriting the sale of the Series P and S preferred stock, Goldman was demanding collateral on its own credit default swaps ranging from 10 to 15% of the value of securities backed by Alt-A and subprime residential mortgages.

74.     Goldman also knew or recklessly disregarded the fact that even the so-called "low-risk" subprime and Alt-A RMBS held by Fannie Mae (rated AAA or AA) were substantially overvalued by the time of the Series P and S offerings. According to the Staff Report, Goldman had maintained and profited from a six to nine month short position of $9 billion in RMBS rated AAA in 2007. Goldman had also issued or marketed a number of AAA-rated subprime mortgage products which had lost substantial value before the Series P and S offerings. Examples include the following:

        a)     In May 2006, Goldman acted as co-lead underwriter in securitizing subprime second lien mortgages originated by a lender, Long Beach Mortgage Corporation. Goldman was able to get AAA ratings on two-thirds of the principal

23

balance of that risky securitization, which Goldman then sold to its customers. A year later, the Long Beach loans began incurring delinquencies, and the securities plummeted in value. According to the Staff Report, "75 out of 75 AAA rated Long Beach securities issued in 2006, were later downgraded to junk status, defaulted or withdrawn." Staff Report at 6.

        b)      In March 2007, Goldman marketed its own CDO called "Timberwolf," which had a large number of securities rated AAA. Six months later, the price of Timberwolf AAA rated securities had dropped almost 80%.

        c)      In March 2007, Goldman marketed a $2 billion CDO known as "Abacus," in which Goldman allowed a hedge fund customer to select lower grade RMBS destined to fail. Goldman then secured a AAA rating from Moody's for Abacus, which securities ultimately failed.

      75.     The Abacus CDO is a particularly egregious example of the scheme employed by Goldman throughout 2007 to defraud investors. Goldman was asked to structure a transaction that would enable a large hedge fund to short multiple RMBS securities. Goldman allowed the hedge fund to provide the criteria used to identify Baa2 rated subprime RMBS securities for the CDO and to approve the securities that were finally selected. After Goldman sold Abacus AAA-rated certificates to investors, Goldman took the short side of the transaction, which it then transferred to the hedge fund. By October 2007, 83% of the assets had received a credit rating downgrade and 17% of the assets had been placed on a negative credit watch.

      76.     Goldman has (to date) paid huge fines and penalties to cover losses realized by investors it swindled. Goldman paid a $550 million civil penalty in July 2010 for misleading investors in the Abacus securitization. Goldman also paid a $27 million fine in September 2010

to Britain's Financial Services Authority.  Goldman paid $60 million in May 2009 to settle an investigation by the Commonwealth of Massachusetts into deceptive lending practices. Goldman also paid $25,650,000 in June 2010 to settle claims of the Montana Commissioner of Securities and Insurance that it misled investors in auction rate securities.  In addition to the previously discussed FHFA lawsuit, the U.S. regulator of credit unions has sued Goldman to recover $49 million for losses sustained by two credit unions that failed after they purchased mortgage-backed securities from Goldman.   The Staff Report identifies other institutional customers that failed after purchasing inflated RMBS from Goldman.

77.    According to the Staff Report, "[I]n 2007, the vast majority of RMBS and CDO securities with AAA ratings incurred substantial losses; some failed outright.  Analysts have determined that over 90% of the AAA ratings given to subprime RMBS securities originated in 2006 and 2007 were later downgraded by the credit rating agencies to junk status. . . . . Investors and financial institutions holding the AAA rated securities lost significant value."  Staff Report at 6.

78.    The Staff Report also concluded that credit rating agencies issued AAA and investment grade ratings at the behest of Wall Street firms who paid for the favorable ratings. Staff Report at 7.  Goldman was one of these Wall Street firms, and it knew that many of the AAA ratings assigned to subprime securitizations were phony, as evidenced by the Long Beach and Abacus securitizations referenced above.  Goldman's knowledge that inflated AAA ratings were assigned to subprime and Alt-A RMBS also establishes its scienter as an underwriter of the Fannie Mae Series P and S preferred stock.

A.    **Goldman Internal Emails Establish Scienter.**

79.    A series of emails circulated internally by Goldman executives beginning in December 2006 and throughout 2007 show that Goldman knew and believed that subprime and

Alt-A residential mortgages were overvalued in the market, and would eventually collapse. These emails show that Goldman said one thing to Plaintiffs and other investors while believing another. Goldman either knew or recklessly disregarded the fact that the Fannie Mae Series P and S preferred stock was virtually worthless when it was sold.

80. By December 2006, executives at the highest levels of Goldman were concerned about the record delinquency rates among subprime mortgage loans and the impact of default on the value of RMBS and collateralized debt obligations ("CDOs") backed by subprime RMBS. On December 14, 2006, David Viniar, Goldman's Executive Vice President and Chief Financial Officer, convened a meeting to address the subprime risk to Goldman's business. Viniar met with several risk managers and senior people from various trading desks. The meeting participants "talked about how the mortgage-backed securities market 'felt.' 'Our guys said that it felt like it was going to get worse before it got better,' Viniar recalled. 'So we made a decision: let's get closer to home.'"("Risk Management," January 4, 2009 *The New York Times*.)

81. In a December 15, 2006 e-mail summarizing the meeting, David Viniar confirms to Tom Montag, head of Sales and Trading at Goldman, "...my basic message was let's be aggressive distributing things because there will be very good opportunities as the markets goes into what is likely to be even greater distress and we want to be in a position to take advantage of them."

82. Subsequent emails from Goldman senior executives provide more compelling evidence that Goldman knew, or recklessly disregarded, that the subprime and Alt-A RMBS and mortgage loans held or guaranteed by Fannie Mae were substantially overvalued:

> a) "The vast majority, if not every 2006 Subprime CES deal (across all originators and shelves), is likely to experience some form of downgrade

26

in their life, and potentially sub-bond writedowns." February 8, 2007 Goldman internal email regarding "2006 Subprime 2nds Deals Continue to Underperform".

b) "Subprime Loans- net short spreads significantly…Alt-A Sector has not been effected yet by lower credit contagion but we expect it to come up so we've upped dilg and are turning the books fast." Email forwarded to Lloyd Blankfein on February 11, 2007. In response, Blankfein asks whether Goldman is "doing enough right now to sell off cats and dogs in other books throughout the division."

c) "Just fyi not for the memo, my understanding is that desk is no longer buying subprime. (We are low balling on bids.)" "Do you want to consider an additional bullet point at the very end that proactively addresses a very hot topic in the resi market place which is the fear that underwriting deterioration may be creeping into near prime product (called Alt-A) as people seek to replace lost subprime business. For example EPDs (early payment defaults) are rising for Alt-A." March 2, 2007 email exchange regarding presentation to Goldman's Audit Committee.

d) "[W]e are trying to close everything down, but stay on short side….and we will likely do some other things like buying puts on companies with exposures to mortgages." March 8, 2007 email from Daniel Sparks to, among others, David Viniar, Tom Montag, Jon Winkelried and Gary Cohn, the Co-Chief Operating Officer of Goldman.

e)    "During the quarter, there has been significant deterioration within the sub
      prime mortgage sector driven by rising delinquencies and failing
      originators. This fact pattern coupled with increased media attention has
      pushed sub prime synthetic and cash spreads dramatically wider. CDO
      spreads have widened as well." "We commenced the quarter long
      mortgage spreads via the ABX index and throughout the quarter covered
      the long position via single name CDS ending the quarter net short
      mortgage spreads." March 9, 2007 email to David Viniar.

f)    "We should add the various things we have done-getting short CDS on
      RMBS and CDOs, getting short the super-senior BBB- and BBB index,
      and getting short AAA index as overall protection. The puts have also
      been good." "The business has purchased $60mm notional of equity put
      options on subprime lenders as risk mitigant to overall subprime
      business."    March 10, 2007 email exchange with Daniel Sparks
      concerning mortgage presentation to Goldman's Board of Directors.

g)    In response to events in subprime sector in Q3 and Q4 2006 and 1Q 2007,
      "GS reverses long market position through purchases of single name CDS
      and reductions of ABX."   In response to "large originators announce
      numerous accounting restatements/losses for 2006" and "securitization for
      subprime slows significantly; market for securities is dislocated" "GS
      effectively halts new purchases of sub-prime loan pools through
      conservative bids… Warehouse lending business reduced." March 26,

2007 Presentation to Goldman's Board of Directors concerning the
subprime mortgage business.

h) "Sparks and the Mtg group are in the process of considering making
significant downward adjustments to the marks on their mortgage
portfolio esp CDOs and CDO squared." May 11, 2007 internal Goldman
email.

i) "Tells you what might be happening to people who don't have the big
short." July 25, 2007 email from David Viniar to Gary Cohn.

j) "[O]verall market events since Jan of this year, but largely concentrated
over the summer period, are as dramatic and interesting as I've seen in
25+ years in the business. I use the word 'interesting' only because we're
past the worst of it *at least as far as our own exposure goes*..." (emphasis
added). "[M]ortgages...ultimately culminating in an understanding that a
large proportion of the 20% of US mortgages which are subprime, may
ultimately become impaired." Goldman's Tax Department Presentation
dated October 29, 2007.

k) "Of course we didn't dodge the mortgage mess. We lost money, then
made more than we lost because of shorts." November 18, 2007 email
from Lloyd Blankfein to Gary Cohn.

83. According to the September 17, 2007 presentation to Goldman's Board of
Directors concerning its residential mortgage business, during the period March 15, 2007
through August 31, 2007, Goldman significantly reduced both its subprime and Alt-A long

29

positions, evidencing Goldman's knowledge that subprime and Alt-A mortgages and securitizations would continue to decline in value.

**B. Goldman's Collateral Demands Establish Scienter**

84. Goldman's related entity, Goldman Sachs International, entered into credit default swap contracts with AIG Financial Products Corp. ("AIG"), whereby it purchased insurance against the risk of default. These contracts allowed Goldman to require AIG to provide cash collateral against the risk of default if the mortgage products declined in value.

85. In late July and early August of 2007, prior to the Series P offering, Goldman demanded approximately $1.2 billion in collateral from AIG related to certain securities, including CDOs backed by subprime and Alt-A RMBS. At this time, Goldman had determined that securities backed by subprime and Alt-A RMBS had significantly deteriorated in value.

86. On November 26, 2007, immediately prior to the Series S offering, Goldman increased its collateral demand to AIG to $3.2 billion, which was about 15% of the value of the securities backed by subprime and Alt-A RMBS. At the same time Goldman was demanding billions in collateral from AIG, Goldman was informing Plaintiffs that Fannie Mae had satisfied its capital requirements, even though Fannie Mae held hundreds of billions of dollars of subprime and Alt-A RMBS and mortgage loans and failed to record any significant write-down or loan loss reserves.

87. In addition to demanding more collateral from AIG, in August 2007 Goldman made margin calls on Thornburg Mortgage, which had borrowed about $200 million from Goldman. These margin calls were made based on Goldman's knowledge that the market value of mortgage-related assets held by Thornburg Mortgage had significantly diminished.

## C.   Goldman's Intimate Familiarity with Mortgage Lenders Establishes Scienter.

88.    In April 2007, Goldman purchased a controlling stake in Avelo Mortgage, L.L.C. d/b/a Senderra Funding ("Senderra"). Goldman had been a minority investor in Senderra when it was formed in 2005. At the time of the Goldman acquisition, Senderra was a subprime lender located in Fort Mill, South Carolina and its subprime operations were overseen by Daniel Sparks, former head of mortgages at Goldman. However, Goldman moved Senderra's focus away from subprime lending and converted Senderra into a Federal Housing Administration (FHA) lender and refinance organization.

89.    Goldman's ownership in Senderra gave Goldman specific knowledge of the state of the subprime mortgage industry. Mortgage experts say the acquisition of Senderra "likely gave Goldman a clearer view of the market as other parts of the company made bets on home loans." *Goldman Subprime Fallout Hits Home in South Carolina* by Aaron Lucchetti, January 21, 2010, The Wall Street Journal Online.

90.    In addition to shorting the mortgage market generally, during the period just prior to the Series P and Series S preferred stock offerings Goldman was betting against the very originators of subprime loan products that were feeding mortgages to Fannie Mae. In a July 25, 2007 email to Daniel Sparks, it was noted that Goldman was "looking for approval to opportunistically buy puts on certain mortgage originators... exposed to RMBS, CMBS. Example names include: Countrywide...".

91.    Goldman knew that Countrywide was Fannie Mae's largest lender customer in 2006 and during the first nine months of 2007. Goldman had purchased loans from Countrywide and other subprime lenders from 2004 to 2006 for securitizations. Goldman was also the underwriter for certain private-label RMBS comprised of Countryside loans such as CWALT

31

2007-OA4 issued on March 28, 2007. Goldman conducted due diligence on these loan originators, and knew about the lax origination practices followed by these subprime lenders.

92. In addition, according to a SEC complaint against Countrywide, the poor quality of the loans originated through Countrywide's exception process became even more obvious in the first quarter of 2007 just as Goldman was starting to short RMBS holdings and request permission to short mortgage originators such as Countrywide. (Exception loans are mortgage loans that do not meet the general underwriting standards of Countrywide.) For example, in documents distributed at a March 12, 2007 meeting of Countrywide's credit risk committee, Countrywide's Risk Management group reported that almost 12 percent of the loans Countrywide reviewed in an internal quality control process were rated "severely unsatisfactory" or "high risk." According to the SEC, the causes for the low ratings were debt to income ratios, loan to value ratios, or FICO scores outside of Countrywide's underwriting guidelines. Similarly, by the second quarter of 2007, Countrywide's Risk Management Group began to report a serious deterioration in the performance of exception loans. The write-downs and increases in loss reserves related to the mortgage pools held by Fannie that were disclosed in its December 31, 2008 Form 10-K indicate that the failures by the originators, such as Countrywide, did in fact impact the loans in these mortgage pools.

93. Goldman's desire to buy puts on Countrywide and other subprime mortgage originators by mid-2007 is further evidence that Goldman knew that Fannie Mae's portfolio of subprime and Alt-A mortgage-related assets and guarantee contracts was significantly impaired at the time of the Series P and Series S offerings.

94. Based on its due diligence of Fannie Mae, Countrywide and other subprime loan originators, as well as its internal practices and proprietary models, Goldman knew or recklessly

32

disregarded the fact that billions of dollars of subprime and Alt-A mortgage-related assets and guarantee contracts held by Fannie Mae were significantly overvalued by the time of the Series P and Series S offerings, including those assigned higher ratings. Goldman knew or recklessly disregarded the fact that Fannie Mae should have taken substantial write downs on its Alt-A and subprime RMBS portfolio, instead of recording no writedowns as of December 31, 2006 and June 30, 2007, and writedowns of only 0.1 percent as of September 30, 2007. Goldman also knew that Fannie Mae should have recorded substantial loan loss reserves far in excess of the 0.33 percent recorded against its portfolio of Alt-A and subprime mortgages as of December 31, 2006, the 0.38 percent recorded as of June 30, 2007, and the 0.45 percent recorded as of September 30, 2007.

**D.      Goldman Had Strong Incentives to Defraud Investors in 2007.**

95.      Goldman had a strong motive and numerous incentives to conceal Fannie Mae's true financial condition. By failing to disclose the value of Fannie Mae's portfolio, Goldman was able to continue to sell its own subprime and Alt-A mortgage products for higher prices than Goldman knew they were worth. Goldman also was able to continue to generate huge profits as an underwriter of securitized residential mortgages. For example, during the year ended November 2007, Goldman securitized $81.4 billion of financial assets, including $24.95 billion of residential mortgages. Goldman acted with scienter because it had enormous financial incentives to complete as many offerings as possible and unload its own subprime and Alt-A RMBS inventory on Fannie Mae and other unsuspecting investors.

96.      By 2007, Goldman had provided billions of dollars of "warehouse" lines of credit to subprime lenders, like Countrywide, to fund mortgages that would be securitized by Goldman. Because of its financial arrangements with these lenders, Goldman was essentially committed to buying the mortgage loans that secured its warehouse lines of credit regardless of their quality

and the results of Goldman's due diligence. Goldman would have realized substantial losses on its warehouse commitments, if it had disclosed to investors in the Series P and S offerings that Fannie Mae's subprime and Alt-A mortgage holdings were drastically overvalued.

97.     Goldman received millions of dollars as compensation for its role as an underwriter of the Fannie Mae Series P and Series S preferred stock offerings. If Goldman had disclosed that Fannie Mae's true financial condition, after taking into account appropriate write-downs and loss reserves of subprime and Alt-A assets, rendered its Core Capital below the level directed by OFHEO, there would have been no Series P or S preferred stock offerings and no underwriters' fees paid to Goldman.

98.     Goldman also had enormous financial incentives to complete as many offerings as possible without regard to the accuracy or completeness of the offering documents and without conducting adequate due diligence. By the end of 2006, Goldman sponsored the securitization of approximately $162 billion of residential mortgage loans, including $15 billion in subprime RMBS and $20.5 billion in Alt-A RMBS. Goldman continued to securitize billions of subprime and Alt-A mortgage loans in 2007. The ability of Goldman to continue to generate profits from additional securitizations of residential mortgages would have been jeopardized if Goldman had disclosed the significant deterioration in value of Fannie Mae's huge subprime and Alt-A portfolio.

## VIII.  PLAINTIFFS' RELIANCE

99.     Goldman's representations in the Offering Documents that Fannie Mae's core capital exceeded the statutory and OFHEO minimum requirements, and that the proceeds of the Series P and Series S stock offerings would create a "surplus" of capital to allow Fannie Mae to withstand the deteriorating market conditions, were material and misled the Plaintiffs into

34

believing that adequate write-downs of assets and increases in loan loss reserves had already been taken.

100. If adequate write-downs and loan loss reserves had been recorded for all of the subprime and Alt-A assets held or guaranteed by Fannie Mae at the time of the Series P and Series S preferred stock offerings, Fannie Mae's core capital would have been substantially below its statutory minimum and OFHEO requirements. Even with the proceeds of these offerings, Fannie Mae would not have been able to meet these capital requirements.

101. Had the Plaintiffs been informed that the valuation placed on hundreds of billions of dollars of subprime and Alt-A RMBS and mortgages held or guaranteed by Fannie Mae was significantly overstated, that the reported write-downs and loan loss reserves were grossly inadequate, and that Fannie Mae would not have met its capital requirements even with the proceeds of the Series P and Series S stock offerings, they would not have purchased either the Series P or Series S preferred stock.

102. Plaintiffs read and relied on Goldman's false and material representations and omissions in deciding to purchase the Series P preferred stock in the initial offering on or about September 28, 2007 and the Series S preferred stock in the initial offering on or about December 11, 2007.

103. In reliance on the representations made by Goldman, Plaintiff Liberty Mutual Insurance Company purchased 600,000 shares of the Series P preferred stock on September 25, 2007 (at $25 per share, an investment of $15 million) and 300,000 shares of the Series S preferred stock on December 6, 2007 (at $25 per share, an investment of $7.5 million).

104.    In reliance on the representations made by Goldman, Plaintiff Liberty Mutual Fire Insurance Company purchased 600,000 shares of the Series P preferred stock on September 25, 2007 (at $25 per share, an investment of $15 million).

105.    In reliance on the representations made by Goldman, Plaintiff Peerless Insurance Company purchased 120,000 shares of the Series S preferred stock on December 6, 2007 (at $25 per share, an investment of $3 million).

106.    In reliance on the representations made by Goldman, Plaintiff Safeco Corporation, through its investment advisor, purchased 800,000 shares of the Series S preferred stock on December 6, 2007 (at $25 per share, an investment of $20 million).

107.    In reliance on the representations made by Goldman, Plaintiff Liberty Life Assurance Company of Boston purchased 80,000 shares of the Series S preferred stock on December 6, 2007 (at $25 per share, an investment of $2 million).

108.    In total, Plaintiffs invested, on the dates of the offerings, $30 million in the Series P preferred shares and $32.5 million in the Series S preferred shares.

## IX.    PLAINTIFFS' LOSS AND LOSS CAUSATION

109.    Goldman's fraudulent misrepresentations that Fannie Mac's core capital exceeded its statutory and OFHEO-directed 30% minimum capital requirements, and its failure to disclose the decline in value of hundreds of billions of dollars of Fannie Mae's subprime and Alt-A holdings, concealed the fact that Fannie Mae was severely undercapitalized at the time of the Series P and Series S preferred stock offerings. These misrepresentations and omissions inflated the price of the Series P and Series S preferred stock, which could not have been sold if the actual deterioration in value of Fannie Mac's subprime and Alt-A assets and resultant capital impairment had been disclosed.

110.    It was foreseeable that Plaintiffs would pay an inflated price for the Series P and Series S preferred stock in reliance on Goldman's misrepresentations and omissions, and that the preferred stock would essentially become worthless once the deteriorating value of the subprime and Alt-A assets and resulting capital impairment of Fannie Mae became known.

111.    During the period from July 2008 and September 2008, a number of partial disclosures were released regarding the deterioration in Fannie Mae's financial condition, causing the price of the Series P and S preferred stock to begin to decline precipitously in value. On September 6, 2008, Fannie Mae was put into conservatorship, and all dividend payments to Series P and S preferred stockholders were terminated.

112.    By December 31, 2008, Fannie Mae had taken additional write-downs of $6.752 on its subprime and Alt-A RMBS, and recorded $24.753 billion in loan loss reserves for its subprime and Alt-A mortgages. These write-downs and loan loss reserves, which should have been disclosed earlier by Goldman, caused Fannie Mae to be undercapitalized and the Series P and S preferred stock to become virtually worthless.

113.    The risks which Goldman concealed regarding Fannie Mae's capitalization and subprime and Alt-A assets materialized after Plaintiffs bought the Series P and Series S preferred stock, causing Fannie Mae to be placed into conservatorship and causing the Series P and Series S preferred stock to become virtually worthless.

114.    As a direct and foreseeable consequence of the misrepresentations of Goldman, Plaintiffs have suffered huge losses on their purchases of the Series P and Series S preferred stock. These losses have been incurred on the shares of stock that Plaintiffs have sold, as well as the shares of stock that Plaintiffs continue to hold.

37

## X.    NO SAFE HARBOR

115.    The statutory safe harbor provided for forward-looking circumstances does not apply to any of the false statements alleged in this Second Amended Complaint. The statements alleged to be false and misleading concerned statements of existing or historical facts or conditions. To the extent that any of the statements may be deemed to be forward-looking statements, Goldman is responsible for those statements nonetheless because the statements were not identified as forward looking statements and/or were material. The statements that are alleged to be false and misleading were not accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the statements. In addition, Goldman knew or recklessly disregarded the fact that the particular statements were false when made.

## XI.    CLAIMS FOR RELIEF

### COUNT I

### (by all Plaintiffs)
### VIOLATION OF SECTION 10(b) OF THE
### EXCHANGE ACT AND SEC RULE 10b-5

116.    Plaintiffs repeat and incorporate herein all prior allegations of this Second Amended Complaint.

117.    This Count is asserted pursuant to Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by the SEC.

118.    Goldman, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or the mails, (a) employed devices, scheme, and artifices to defraud; (b) made untrue statements of material facts and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of conduct of business which operated as a fraud and deceit upon the purchasers of Fannie Mae's Series P and

38

Series S preferred stock, including Plaintiffs, in an effort to maintain an artificially high price for Fannie Mae's Series P and Series S preferred stock.

119.    Goldman (a) deceived the investing public, including Plaintiffs, (b) artificially inflated the price of Fannie Mae's Series P and Series S preferred stock, and (c) caused Plaintiffs to purchase Fannie Mae's Series P and Series S preferred stock at the artificially inflated prices.

120.    As set forth above, Goldman made the false and misleading statements and omissions and engaged in the fraudulent activity set forth herein intentionally and knowingly, or in reckless disregard so as to constitute willful deceit and fraud upon Plaintiffs.

121.    Goldman knew of the misrepresentations and omissions of material fact, or acted with reckless disregard for the truth.  Goldman's material misrepresentations and/or omissions were done knowingly or recklessly for the purpose and effect of hiding Fannie Mae's adverse financial condition from Plaintiffs and the investing public and supporting the artificially inflated price of Fannie Mae's Series P and Series S preferred stock.

122.    As a result of Goldman's fraud, Fannie Mae's Series P and Series S preferred stock price was artificially inflated.

123.    In reliance upon Goldman's false and misleading statements, and in ignorance of the false and misleading nature of Goldman's false statements and omissions, Plaintiffs purchased the Series P and Series S preferred stock at artificially inflated prices and Plaintiffs were thereby damaged.

124.    As set forth above, when the true facts were subsequently disclosed, the prices of Fannie Mae's Series P and Series S preferred stock  dropped precipitously.

125.    As a direct and proximate result of Goldman's wrongful conduct, Plaintiffs have suffered damages.

126.   If Plaintiffs had known about the true condition of Fannie Mae, Plaintiffs would not have purchased Fannie Mae's Series P and Series S preferred stock, or would not have done so at the artificially inflated prices at which Plaintiffs paid.

## COUNT II

### (by Plaintiffs Liberty Mutual Insurance Company, Liberty Mutual Fire Insurance Company, Peerless Insurance Company and Liberty Life Assurance Company of Boston) VIOLATION OF M.G.L. c. 110A § 410(a)(2)

127.   The Plaintiffs repeat and incorporate herein all prior allegations of this Second Amended Complaint.

128.   This claim is made pursuant to M.G.L. c. 110A § 410(a)(2) by Plaintiffs Liberty Mutual Insurance Company, Liberty Mutual Fire Insurance Company, Peerless Insurance Company and Liberty Life Assurance Company of Boston, which purchased the Fannie Mae Series P and Series S preferred stock in Massachusetts in the primary market pursuant to the Offering Documents.

129.   Goldman offered and sold the Fannie Mae Series P and Series S preferred stock in Massachusetts by means of the Offering Documents.  Goldman's solicitation activities for the Fannie Mae Series P and Series S preferred stock generally would have included preparing and distributing the Offering Documents, contacting potential investors, taking orders and delivering the securities.  Goldman solicited the sale of the Fannie Mae Series P and Series S preferred for its own benefit and was paid a percentage of the total dollar amount of the offering.

130.   Goldman successfully solicited the Plaintiffs' purchase of the Fannie Mae Series P and Series S preferred stock for its own benefit.  As a lead underwriter, Goldman prepared and distributed the Offering Documents, performed due diligence, and communicated with the Plaintiffs about the offering and Plaintiffs' purchase.

131.    Goldman offered and sold the Fannie Mae Series P and Series S preferred stock in Massachusetts by means of untrue statements of material facts and omissions of material facts necessary to make the statements that were made not misleading in the Offering Documents, as alleged above.  Goldman knew or in the exercise of reasonable care would have known of the untrue statements, the material omissions, and the misleading nature of the statements made.

132.    The Plaintiffs did not know that the statements made in the Offering Documents were untrue and misleading.

133.    Plaintiffs have suffered damages in connection with their purchase of the Fannie Mae Series P and Series S preferred stock.

## COUNT III

### (by Plaintiffs Liberty Mutual Insurance Company, Liberty Mutual Fire Insurance Company, Peerless Insurance Company and Liberty Life Assurance Company of Boston) VIOLATION OF M.G.L. c. 93A, § 11

134.    The Plaintiffs repeat and incorporate herein all prior allegations of this Second Amended Complaint.

135.    This claim is made pursuant to M.G.L. c. 93A § 11 by Plaintiffs Liberty Mutual Insurance Company, Liberty Mutual Fire Insurance Company, Peerless Insurance Company and Liberty Life Assurance Company of Boston.

136.    The Plaintiffs and Goldman are engaged in the conduct of trade or commerce.

137.    The Plaintiffs relied on Goldman's misrepresentations and omissions and suffered their losses in Massachusetts.

138.    Goldman knowingly or willfully engaged in unfair or deceptive conduct, including but not limited to unfair or deceptive acts or practices declared unlawful by rules or

41

regulations issued under paragraph (c) of § 2 of Chapter 93A, namely §§ 3.05 and 3.162(2) of 940 CMR 3.00.

139.    The Plaintiffs have suffered a loss of money as a result of Goldman's unfair or deceptive conduct, which loss was foreseeable to Goldman.

### COUNT IV

**(by Plaintiff Safeco Corporation)**
**VIOLATION OF WASH. REV. CODE § 21.20.010 and § 21.20.430**

140.    Plaintiff repeats and incorporates herein all prior allegations of this Second Amended Complaint.

141.    This claim is made pursuant to WASH. REV. CODE § 21.20.010 and § 21.20.430 by Plaintiff Safeco Corporation, which purchased the Fannie Mae Series S preferred stock in the primary market pursuant to the Offering Documents.

142.    Goldman offered and sold the Fannie Mae Series S preferred stock to Safeco Corporation by means of the Offering Documents.  Goldman's solicitation activities for the Fannie Mae Series S preferred stock generally included preparing and distributing the Offering Documents, contacting potential investors, taking orders and delivering the securities.  Goldman solicited the sale of the Fannie Mae Series S preferred stock for its own benefit and was paid a percentage of the total dollar amount of the offering.

143.    Goldman successfully solicited the Plaintiff's purchase of the Fannie Mae Series S preferred stock for its own benefit.  As a lead underwriter, Goldman prepared and distributed the Offering Documents, conducted a due diligence investigation, and would have contacted the Plaintiff's investment advisor to inform them of the offering and communicated with the Plaintiff's investment advisor to take the order.   Goldman's conduct was a substantial contributing factor in the Plaintiff's purchase of the Fannie Mae Series S preferred.

144.   Goldman offered and sold Fannie Mae Series S preferred to Safeco Corporation by (a) employing devices, a scheme, and artifices to defraud; (b) making untrue statements of material facts and by omitting material facts necessary to make the statements that were made not misleading; and (c) engaging in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of Fannie Mae Series S preferred stock, including Safeco Corporation, as alleged above.

145.   Plaintiff and its investment advisor did not know that the statements made were untrue and misleading and reasonably relied upon them to their detriment.

146.   Plaintiff suffered a substantial loss on the Fannie Mae Series S preferred stock.

147.   As a result of its reliance on Goldman's statements, Plaintiff has suffered damages in an amount to be proved at trial.

## COUNT V

### (by Plaintiff Safeco Corporation)
### VIOLATION OF WASH. REV. CODE § 19.86.020 and § 19.86.090

148.   Plaintiff repeats and incorporates herein all prior allegations of this Second Amended Complaint.

149.   This claim is made pursuant to WASH. REV. CODE § 19.86.020 and § 19.86.090 by Plaintiff Safeco Corporation.

150.   Plaintiff and Goldman are engaged in the conduct of trade or commerce.

151.   Goldman committed the deceptive act of making untrue statements of material fact and by omitting material facts necessary to make the statements that were made not misleading in the course of their business. Goldman repeatedly committed such deceptive acts in connection with various Fannie Mae preferred stock offerings, including Series S, which Safeco Corporation purchased through its investment advisor. This deception affected the public

43

interest and many other individual and institutional consumers (such as Plaintiffs Liberty Mutual Insurance Company, Liberty Mutual Fire Insurance Company, Peerless Insurance Company and Liberty Life Assurance Company of Boston), causing them to incur substantial financial losses.

152.    Goldman's use or employment of an unfair or deceptive act caused Safeco Corporation to suffer substantial financial injury to its business.

## COUNT VI
## COMMON-LAW FRAUD

153.    Plaintiffs repeat and incorporate herein all prior allegations of this Second Amended Complaint.

154.    As alleged above, Goldman made, participated in, authorized, and caused to be made false representations of material facts; omitted material facts necessary to make other statements Goldman made not misleading; and omitted facts basic to the relevant transactions which the Plaintiffs would have reasonably expected Goldman to disclose; and Goldman did so with the purpose of inducing the Plaintiffs to purchase Fannie Mae Series P and Series S preferred stock.

155.    The Plaintiffs reasonably and justifiably relied on Goldman's false representations and omissions in purchasing Fannie Mae Series P and Series S preferred stock and as a result have suffered substantial damages.

## COUNT VII
## COMMON-LAW NEGLIGENT MISREPRESENTATION

156.    The Plaintiffs repeat and incorporate herein all prior allegations of this Second Amended Complaint.

157.    As alleged above, Goldman supplied false representations to guide the Plaintiffs in their Fannie Mae Series P and Series S preferred stock purchases.

44

158.   Goldman made such false representations in the course of its underwriting business and in the context of its business transactions with the Plaintiffs.

159.   Goldman failed to exercise reasonable care or competence in obtaining or communicating the false representations at issue.

160.   The Plaintiffs reasonably relied upon the false statements made by Goldman, which have proximately caused the Plaintiffs to suffer substantial pecuniary damages.

## REQUESTS FOR RELIEF

WHEREFORE, the Plaintiffs pray that this Honorable Court:

1.   ENTER judgment against Goldman and for the Plaintiffs on each Count of the Second Amended Complaint in an amount sufficient to compensate them for their losses as described herein;

2.   AWARD Plaintiffs treble damages, reasonable attorneys' fees, costs and disbursements based upon MGL c. 93A;

3.   AWARD Plaintiffs treble damages, reasonable attorneys' fees, costs and disbursements based upon WASH. REV. CODE § 19.86.020;

4.   AWARD prejudgment and post-judgment interest as allowed by law; and

5.   AWARD such other or further relief as this Honorable Court deems just and proper.

## JURY TRIAL DEMAND

Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs demand a trial by jury of all of the claims asserted in this Second Amended Complaint so triable.

Respectfully submitted,
LIBERTY MUTUAL INSURANCE
COMPANY, LIBERTY MUTUAL FIRE
INSURANCE COMPANY, PEERLESS
INSURANCE COMPANY, SAFECO
CORPORATION, and LIBERTY LIFE
ASSURANCE COMPANY OF BOSTON

By their attorneys:

Christopher P. Sullivan, Esq.
  BBO #485120, #CS9922
Lisa A. Furnald, Esq.
  BBO #631059
Robins, Kaplan, Miller & Ciresi L.L.P.
800 Boylston St., 25th Floor
Boston, MA 02199-7610
617-267-2300
cpsullivan@rkmc.com
lafurnald@rkmc.com

Thomas B. Hatch, Esq. (*pro hac vice*)
James R. Safley, Esq. (*pro hac vice*)
Robins, Kaplan, Miller & Ciresi L.L.P.
800 LaSalle Avenue
2800 LaSalle Plaza
Minneapolis, MN 55402-2015

Dated: March 2, 2012

## CERTIFICATE OF SERVICE

I, Christopher P. Sullivan, hereby certify that on March 2, 2012, I caused the attached Second Amended Complaint to be served First-Class Mail upon counsel of record.

Christopher P. Sullivan

35409507

46

| | |
|---|---|
| Samuel Howard Rudman | Joseph W. Cotchett |
| Robbins Geller Rudman & Dowd LLP(LI) | Cotchett, Pitre & McCarthy, LLP |
| 58 South Service Road | 840 Malcolm Rd. |
| Suite 200 | Burlingame, CA 94010 |
| Melville, NY 11747 | (650)697-6000 |
| (631)367-7100 | Fax: (650)697-0577 |
| Fax: (631)367-1173 | Email: jcotchett@cpmlegal.com |
| Email: srudman@csgrr.com | |
| Patrick Vincent Dahlstrom | Gregory Mark Nespole |
| Pomerantz Haudek Block Grossman | Wolf Haldenstein Adler Freeman & Herz LLP |
| & Gross LLP | 270 Madison Avenue |
| 100 Park Avenue, 26th Floor | New York, NY 10017 |
| New York, NY 10017 | (212)545-4657 |
| (212)661-1100 | Fax: (212)545-4693 |
| Fax: (212)661-8665 | Email: nespole@whafh.com |
| Email: pvdahlstrom@pomlaw.com | |
| Gustavo Fabian Bruckner | Martin E. Restituyo |
| Pomerantz Haudek Block Grossman | Wolf Haldenstein Adler Freeman & Herz |
| & Gross LLP | 270 Madison Avenue |
| 100 Park Avenue, 26th Floor | New York, NY 10016 |
| New York, NY 10017 | (212)545-4702 |
| 212.661-1100 | Fax: (212)686-0114 |
| Email: gfBruckner@pomlaw.com | Email: restituyo@whafh.com |
| H. Adam Prussin | Fei-Lu Qian |
| Pomerantz Haudek Block Grossman | Pomerantz Haudek Block Grossman |
| & Gross LLP | & Gross LLP |
| 100 Park Avenue, 26th Floor | 100 Park Avenue, 26th Floor |
| New York, NY 10017 | New York, NY 10017 |
| (212)661-1100 | (212)661-1100 |
| Fax: (212)661-8665 | Fax: (212)661-8665 |
| Email: HAPrussin@Pomlaw.Com | Email: flqian@pomlaw.com |
| Marc Ian Gross | Ronen Sarraf |
| Pomerantz Haudek Block Grossman | Sarraf Gentile, LLP |
| & Gross LLP | 116 John Street |
| 100 Park Avenue, 26th Floor | Suite 2310 |
| New York, NY 10017 | New York, NY 10038 |
| (212)661-1100 | (212)868-3610 |
| Fax: (212)661-8665 | Fax: (212)918-7967 |
| Email: migross@pomlaw.com | Email: ronen@sarrafgentile.com |

| | |
|---|---|
| Jonathan H. Beemer | Jonathan Paul Whitcomb |
| Entwistle & Cappucci LLP (NYC) | Diserio Martin O'Connor & Castiglioni LLP |
| 280 Park Avenue | One Atlantic Street |
| 26th Floor West | Stamford, CT 06901 |
| New York, NY 10017 | (203)358-0800 |
| (212)894-7276 | Fax: (203)348-2321 |
| Fax: (212)894-7272 | Email: jwhitcomb@dmoc.com |
| Email: jbeemer@entwistle-law.com | |
| Robert N Cappucci | Stephen David Oestreich |
| Entwistle & Cappucci LLP(NJ) | Entwistle & Cappucci LLP (NYC) |
| 30 Columbia Turnpike, Suite 205 | 280 Park Avenue |
| Florham Park, NJ 07932 | 26th Floor West |
| (212)894-7207 | New York, NY 10017 |
| Fax: (212)894-7272 | (212)894-7270 |
| Email: rcappucci@entwistle-law.com | Fax: (212)894-7252 |
| | Email: soestreich@tnsj-law.com |
| Vincent R. Cappucci | Kent Andrew Bronson |
| Entwistle & Cappucci LLP | Milberg LLP (NYC) |
| 280 Park Avenue | One Pennsylvania Plaza |
| New York, NY 10017 | New York, NY 10119 |
| (212)894-7200 | (212)594-5300 |
| Email: vcappucci@entwistle-law.com | Fax: (212)504-8054 |
| | Email: kbronson@milberg.com |
| Roland Winfield Riggs, IV | Joe R. Whatley, JR. |
| Milberg LLP (NYC) | Whatley, Drake & Kallas, LLC (NYC) |
| One Pennsylvania Plaza | 1540 Broadway, 37th Floor |
| New York, NY 10119 | New York, NY 10036 |
| (212)594-5300 | (212)447-7070 |
| Fax: (212)271-8258 | Fax: (212)447-7077 |
| Email: rriggs@milberg.com | Email: jwhatley@whatleydrake.com |
| William Bernard Federman | Matthew Gluck |
| Federman & Sherwood | Fried, Frank, Harris, Shriver & Jacobson |
| 10205 N. Pennsylvania | One New York Plaza |
| Oklahoma City, OK 73102 | New York, NY 10004 |
| (405)235-1560 | (212)594-5300 |
| Fax: (405)239-2112 | Fax: (212)868-1229 |
| Email: wbf@federmanlaw.com | Email: mgluck@milberg.com |
| Charles Robert Cohen | Peter S. Pearlman |
| Cohn, Lifland, Pearlman, Herrmann | Cohn, Lifland, Pearlman, Herrmann |
| & Knopf, L.L.P. | & Knopf, LLP |
| Park 80 Plaza West One | Park 80 Plaza West-One |
| Saddle Brook, NJ 07663 | Saddle Brook, NJ 07410 |
| (201)845-9600 | (551)497-7131 |
| Fax: (201)845-9423 | Fax: (201)845-9423 |
| Email: crc@njlawfirm.com | Email: psp@njlawfirm.com |

| | |
|---|---|
| Edward W. Ciolko<br>Kessler Topaz Meltzer & Check, LLP<br>280 King of Prussia Road<br>Radnor, PA 19087<br>(610)667-7706<br>Fax: (610)667-7056<br>Email: eciolko@ktmc.com | Joseph H. Meltzer<br>Kessler Topaz Meltzer & Check, LLP<br>280 King of Prussia Road<br>Radnor, PA 19087<br>(610)667-7706 x1210<br>Fax: (610)667-7056<br>Email: jmeltzer@ktmc.com |
| Julie Siebert-Johnson<br>Kessler Topaz Meltzer & Check, LLP<br>280 King of Prussia Road<br>Radnor, PA 19087<br>(610)667-7706<br>Fax: (610)667-7056<br>Email: jsjohnson@ktmc.com | Katherine B. Bornstein<br>Kessler Topaz Meltzer & Check, LLP<br>280 King of Prussia Road<br>Radnor, PA 19087<br>(610)667-7706<br>Fax: (610)667-7056<br>Email: kbornstein@ktmc.com |
| Mark K. Gyandoh<br>Kessler Topaz Meltzer & Check, LLP<br>280 King of Prussia Road<br>Radnor, PA 19087<br>(610)667.7706<br>Fax: (610)667.7056<br>Email: mgyandoh@ktmc.com | Samuel Kenneth Rosen<br>Harwood Feffer LLP<br>488 Madison Avenue<br>New York, NY 10022<br>(212)935-7400<br>Fax: (212)753-3630<br>Email: srosen@hfesq.com |
| Andrew J. Frisch<br>40 Fulton Street<br>23rd Floor<br>New York, NY 10038<br>(212)285-8000<br>Fax: (646)304-0352<br>Email: afrisch@andrewfrisch.com | Andrew J. Mytelka<br>Greer, Herz & Adams, LLP (Galveston)<br>One Moody Plaza<br>18th Floor<br>Galveston, TX 77550<br>(409)797-3200<br>Fax: (409)766-6424<br>Email: amytelka@greerherz.com |
| Eric J. Kirkpatrick<br>Greer, Herz & Adams, LLP (Galveston)<br>One Moody Plaza<br>18th Floor<br>Galveston, TX 77550<br>(409)797-3200<br>Fax: (409)766-6424<br>Email: ekirkpatrick@greerherz.com | Joseph A.C. Fulcher<br>Greer, Herz & Adams, LLP (League City)<br>2525 South Shore Boulevard<br>Suite 203<br>League City, TX 77573<br>(409)797-3210<br>Fax: (281)538-3791<br>Email: jfulcher@greerherz.com |
| M. David Leblanc<br>Greer, Herz & Adams, LLP (Galveston)<br>One Moody Plaza, 18th Floor<br>Galveston, TX 77550<br>(409)797-3200<br>Fax: (409)766-6424<br>Email: mleblanc@greerherz.com | Steven Carl Windsor<br>Greer, Herz & Adams, LLP (Galveston)<br>One Moody Plaza, 18th Floor<br>Galveston, TX 77550<br>(409)797-3200<br>Fax: (409)766-6424<br>Email: swindsor@greerherz.com |

| | |
|---|---|
| John Bucher Isbister | Toyja Eran Libia Kelley |
| Tydings & Rosenberg, LLP | Tydings & Rosenberg, LLP |
| 100 East Pratt Street, 26th Floor | 100 East Pratt Street, 26th Floor |
| Baltimore, MD 21202 | Baltimore, MD 21202 |
| (410)752-9714 | (410)752-9742 |
| Fax: (410)727-5460 | Fax: (410)727-5460 |
| Email: jisbister@tydingslaw.com | Email: tkelley@tydingslaw.com |
| Matthew Philip Siben | John J. Clarke , Jr |
| Dietrich Siben Thorpe LLP | DLA Piper US LLP (NY) |
| 2173 Salk Avenue | 1251 Avenue of the Americas |
| Suite 250 | New York, NY 10020 |
| Carlsbad, CA 92008 | (212)335-4500 |
| 760-579-7638 | Fax: (212)335-4501 |
| Fax: 760-579-7639 | Email: john.clarke@dlapiper.com |
| Email: matthew@dstlegal.com | |
| David Fleischer | James Evan Berger |
| Paul, Hastings, Janofsky & Walker LLP (NYC) | Paul, Hastings, Janofsky & Walker LLP |
| 75 East 55th Street | 75 East 55th Street |
| New York, NY 10022 | New York, NY 10022 |
| (212)318-6000 | (212)318-6450 |
| Fax: (212)230-7637 | Fax: (212)2307857 |
| Email: davidfleischer@paulhastings.com | Email: jamesberger@paulhastings.com |
| Scott M. Flicker | Scott N. Auby |
| Paul, Hastings, Janofsky & Walker LLP | Debevoise & Plimpton LLP (DC) |
| 1299 Pennsylvania Avenue, NW | 555 13th Street, N.W. |
| Tenth Floor | Washington, DC 20004 |
| Washington, DC 20004-2400 | (202)383-8053 |
| Email: scottflicker@paulhastings.com | Fax: (202)383-9238 |
| | Email: snauby@debevoise.com |
| Jonathan Rosser Tuttle | Bronson Jeffrey Bigelow |
| Debevoise & Plimpton LLP (DC) | Jones Day (NYC) |
| 555 13th Street, N.W. | 222 East 41st Street |
| Washington, DC 20004 | New York, NY 10017 |
| (202)383-8070 | (212)326-8339 |
| Fax: (202)383-8118 | Fax: (212)755-7306 |
| Email: jrtuttle@debevoise.com | Email: bjbigelow@jonesday.com |
| George S Wang | Michael Joseph Chepiga |
| Simpson Thacher & Bartlett LLP (NY) | Simpson Thacher & Bartlett LLP (NY) |
| 425 Lexington Avenue | 425 Lexington Avenue |
| New York, NY 10017 | New York, NY 10017 |
| (212)455-2228 | (212)455-2598 |
| Fax: (212)455-2502 | Fax: (212)455-2502 |
| Email: gwang@stblaw.com | Email: mchepiga@stblaw.com |

| | |
|---|---|
| Paul C. Curnin<br>Simpson Thacher & Bartlett LLP (NY)<br>425 Lexington Avenue<br>New York, NY 10017<br>(212)455-2000<br>Fax: (212)455-2502<br>Email: pcurnin@stblaw.com | Agnes Dunogue<br>Simpson Thacher & Bartlett LLP (NY)<br>425 Lexington Avenue<br>New York, NY 10017<br>(212)455-2000<br>Fax: (212)455-2502<br>Email: adunogue@stblaw.com |
| Craig Scott Waldman<br>Simpson Thacher & Bartlett LLP (NY)<br>425 Lexington Avenue<br>New York, NY 10017<br>(212)455-2881<br>Fax: (212)455-2502<br>Email: cwaldman@stblaw.com | Jeffrey W. Kilduff<br>O'Melveny & Myers LLP (DC)<br>1625 Eye Street, NW<br>Washington, DC 20006<br>(202)383-5383<br>Fax: (202)383-5414<br>Email: jkilduff@omm.com |
| Michael John Walsh<br>O'Melveny & Myers LLP (DC)<br>1625 Eye Street, NW<br>Washington, DC 20006<br>202 383-5280<br>Fax: 202 383-5414<br>Email: mwalsh@omm.com | Robert Norris Eccles<br>O'Melveny & Myers LLP (DC)<br>1625 Eye Street, NW<br>Washington, DC 20006<br>(202)383-5363<br>Fax: (202)383-5414<br>Email: reccles@omm.com |
| Eric Samuel Olney<br>Latham & Watkins ,LLP<br>885 Third Avenue, Suite 1000<br>New York, NY 10022<br>(212)906-1645<br>Fax: (212)751-4864<br>Email: eric.olney@lw.com | James Ellis Brandt<br>Latham & Watkins LLP<br>885 Third Avenue, Suite 1000<br>New York, NY 10022<br>(212)906-1278<br>Fax: (212)751-4864<br>Email: james.brandt@lw.com |
| Jeff G. Hammel<br>Latham and Watkins (NY)<br>885 Third Avenue<br>New York, NY 10022<br>(212)906-1200<br>Fax: (212)751-4864<br>Email: jeff.hammel@lw.com | Andrew James Ehrlich<br>Paul, Weiss, Rifkind, Wharton<br>  & Garrison LLP (NY)<br>1285 Avenue of the Americas<br>New York, NY 10019<br>(212)373-3166<br>Fax: 212.373-0166<br>Email: aehrlich@paulweiss.com |
| Martin Flumenbaum<br>Paul, Weiss, Rifkind, Wharton & Garrison LLP<br>1285 Avenue of the Americas<br>New York, NY 10019<br>(212)373-3191<br>Fax: (212)492-0191<br>Email: mflumenbaum@paulweiss.com | Roberta Ann Kaplan<br>Paul, Weiss, Rifkind, Wharton<br>  &Garrison LLP (NY)<br>1285 Avenue of the Americas<br>New York, NY 10019<br>212-373-3086<br>Fax: 212-373-2037<br>Email: rkaplan@paulweiss.com |

| | |
|---|---|
| Tobias James Stern<br>Paul, Weiss, Rifkind, Wharton & Garrison LLP<br>1285 Avenue of the Americas<br>New York, NY 10019<br>(212)373-3709<br>Fax: (212)492-0709<br>Email: tstern@paulweiss.com | James J. Coster<br>Satterlee Stephens Burke & Burke LLP<br>230 Park Avenue<br>New York, NY 10169<br>212-818-9200<br>Fax: 212-818-9606<br>Email: jcoster@ssbb.com |
| Joshua M. Rubins<br>Satterlee Stephens Burke & Burke LLP<br>230 Park Avenue<br>New York, NY 10169<br>(212)404-8731<br>Fax: (212)818-9606<br>Email: jrubins@ssbb.com | Justin Evan Klein<br>Satterlee Stephens Burke & Burke LLP<br>230 Park Avenue<br>New York, NY 10169<br>(212)404-8706<br>Fax: (212)818-9606<br>Email: jklein@ssbb.com |
| David W Fassett<br>Arseneault, Whipple, Fassett & Azzarrello, LLP<br>560 Main Street<br>Chatham, NJ 07928<br>(973)635-3366<br>Fax: (973)635-0855<br>Email: fassett@awffa.com | Eric Samuel Olney<br>Latham & Watkins ,LLP<br>885 Third Avenue, Suite 1000<br>New York, NY 10022<br>(212)906-1645<br>Fax: (212)751-4864<br>Email: eric.olney@lw.com |
| Gregory Bertram Reilly , III<br>Littler Mendelson, P.C. (NYC)<br>900 Third Avenue<br>8th Floor<br>New York, NY 10022<br>(973)621-3200<br>Fax: (973)621-3199<br>Email: greilly@littler.com | Mary Gibbons Whipple<br>Arseneault, Whipple, Fassett &Azzarello, LLP<br>560 Main Street<br>Chatham, NJ 07928<br>(973)635-3366<br>Fax: (973)635-0855<br>Email: mgwhipple@awffa.com |
| Thomas J. McKenna<br>GAINEY & McKENNA<br>440 Park Avenue South, 5th Floor<br>New York, NY 10016<br>(212)983-1300<br>Email: tjmckenna@gaineyandmckenna.com | Andrew J. Levander<br>Dechert LLP<br>1095 Avenue of the Americas<br>New York, NY 10036-6797<br>(212) 698-3500<br>Fax: (212) 698-3599<br>Email: Andrew.levander@dechert.com |
| Daniel Poss<br>Goodwin Procter, LLP (Boston)<br>53 State Street,Exchange Place<br>Boston, MA 02109<br>(617)570-1886<br>Fax: (617)-523-1231<br>Email: sposs@goodwinprocter.com | Hector Gonzalez<br>Dechert LLP<br>1095 Avenue of the Americas<br>New York, NY 10036-6797<br>(212) 698-3500<br>Fax: (212) 698-3599<br>Email: hector.gonzalez@dechert.com |

| David P. Staubitz | Shannon P. Torres |
|---|---|
| Dechert LLP | SIMPSON THACHER & BARTLETT LLP |
| 1095 Avenue of the Americas | 425 Lexington Avenue |
| New York, NY 10036-6797 | New York, NY 10017 |
| (212) 698-3500 | (212) 455-2000 |
| Fax: (212) 698-3599 | Fax: (212) 455-2502 |
| Email: david.staubitz@dechert.com | Email: storres@stblaw.com |
| | |
| Jonathan K. Youngwood | |
| SIMPSON THACHER & BARTLETT LLP | |
| 425 Lexington Avenue | |
| New York, NY 10017 | |
| (212) 455-2000 | |
| Fax: (212) 455-2502 | |
| Email: jyoungwood@stblaw.com | |

35397954.1